07-0795-cv
*Simsbury-Avon Pres. Soc'y, LLC, et al. v. Metacon Gun Club, Inc.*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: August 4, 2008)                    Decided: July 31, 2009)

Docket No. 07-0795-cv

_____

DEAN M. CORDIANO,

*Special Master*,

SIMSBURY-AVON PRESERVATION SOCIETY, LLC, and GREGORY SILPE,

*Plaintiffs-Appellant*s,

-v.-

METACON GUN CLUB, INC., ITS MEMBERS AND GUESTS,

*Defendants-Appellee*s,

ROBERT PATRICELLI, RINALDO TEDESCHI, DIANE TEDESCHI, SHELDON CHERRY,

*Plaintiffs*.

_____

Before:        RAGGI, WESLEY, and LIVINGSTON, *Circuit Judges.*

_____

Plaintiffs-Appellants brought suit against Defendants-Appellees Metacon Gun Club, Inc., and

its members and guests (collectively referred to as "Metacon") for violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k, and Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387, resulting from the discharge and accumulation of lead shot on Metacon's property. Plaintiffs-Appellants now appeal from several decisions of the United States District Court for the District of Connecticut (Arterton, J.), dismissing their claims. We defer to the EPA's interpretation of the applicable RCRA permit regulations, and hold that they do not apply to the regular, intended use of lead shot on a shooting range. Therefore, we conclude that the district court properly dismissed Plaintiffs-Appellants' claim based on the alleged disposal of hazardous waste without a RCRA permit, in violation of 42 U.S.C. § 6925(a). We also hold that the Plaintiffs-Appellants have failed to adduce sufficient evidence to create a material issue of fact regarding whether lead contamination on the shooting range constitutes "an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Thus, we affirm the district court's grant of summary judgment to Metacon on Plaintiffs-Appellants' RCRA "imminent and substantial endangerment" claim. Finally, we hold that the Plaintiffs-Appellants failed to set forth sufficient evidence to create a material issue of fact as to whether the gun club is discharging lead shot into "navigable waters" from a "point source." 33 U.S.C. § 1362(12). Accordingly, we affirm the district court's grant of summary judgment to Metacon on Plaintiffs-Appellants' CWA permit claim.

———————————————————————

Affirmed.

ANDREW J. McDONALD, JAMES T. SHEARIN, DIANE

2

WOODFIELD WHITNEY, Pullman and Comley, LLC, Hartford, Conn., *for Plaintiffs-Appellants*.

M. REED HOPPER, Pacific Legal Foundation, Bellevue, Wash., *for Defendants-Appellees*.

AMBER BLAHA, KATHERINE J. BARTON, BRADFORD MCLANE, Attorneys, United States Department of Justice, Environment and Natural Resources Division, KARYN WENDELOWSKI, Office of the General Counsel, United States Environmental Protection Agency, DANIEL INKELAS, Office of the Chief Counsel, United States Army Corps of Engineers, *for Amici Curiae the United States*.

JAMES G. MURPHY, for Amici Curiae National Wildlife Federation, Connecticut Fund for the Environment, Conservation Law Foundation, Environmental Advocates of New York, Farmington River Watershed Association, Natural Resources Defense Council, Rivers Alliance of Connecticut, Sierra Club, and Vermont Natural Resources Council, Inc., *supporting Plaintiffs-Appellants*.

DEIRDRE G. DUNCAN, VIRGINIA S. ALBRECHT, JEFFREY C. COREY, for Amici Curiae the National Association of Home Builders, the American Farm Bureau Federation, and the Chamber of Commerce of the United States of America, *supporting Defendants-Appellees*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Plaintiffs-Appellants appeal from the judgment of the United States District Court for the District of Connecticut (Arterton, J.), dismissing various claims under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k, and the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387. First, the district court dismissed Plaintiffs-Appellants' permitting violation claim under 42 U.S.C. § 6925(a), for failure to state a claim. Second, the district court granted Defendants-Appellees summary judgment on Plaintiffs-Appellants' RCRA "open dumping" and

"imminent and substantial endangerment" claims under 42 U.S.C. § 6945 and 42 U.S.C. § 6972(a)(1)(B). Finally, the district court granted Defendants-Appellees summary judgment on the claim that Defendants-Appellees are discharging pollutants into navigable waters without a permit in violation of the CWA, 33 U.S.C. § 1311(a). We affirm the decisions of the district court. With respect to the Plaintiffs-Appellants' RCRA "imminent and substantial endangerment" claim and CWA permitting claim, however, we affirm on alternative grounds.

**BACKGROUND**

Plaintiffs-Appellants are Simsbury-Avon Preservation Society, LLC, a group of homeowners who live near Defendants-Appellees' shooting range, and Gregory Silpe, a member thereof (collectively referred to as "SAPS"). Defendants-Appellees Metacon Gun Club, Inc., and its members and guests (collectively referred to as "Metacon") operate a shooting range that, according to SAPS, engages in the discharge and accumulation of lead munitions on Metacon's site in violation of the RCRA and the CWA. The following factual background is drawn from the record assembled in connection with Metacon's motion to dismiss and its two summary judgment motions.

**I. The Metacon Site**

Metacon has operated a private outdoor shooting range at its present location on 106 Nod Road in Simsbury, Connecticut since the mid-1960s. Metacon's range is located on 137 acres of woods, meadows, wetlands and mountainside, and is situated on a flood plain of the Farmington River Valley. The site is bounded to the north by the Connecticut State Police pistol and rifle ranges, to the west by Nod Road and the Farmington River, to the south by a residence and a golf course, and to the east by a cliff that runs along the entire eastern property boundary.

SAPS provided evidence that, due to flooding at the site and overflow of the Farmington

River, there is an occasional hydrologic connection between waters on the Metacon site and the Farmington River. SAPS also provided limited evidence of a continuous surface water connection between wetlands on the Metacon site and a body of water called Horseshoe Cove, a tributary that flows directly into the Farmington River. Metacon provided evidence to the contrary.

Metacon has a 100-yard shooting range at the back of which stands an engineered earthen berm for bullet containment. There is evidence indicating that wetlands on the Metacon site are located in close proximity to the berm and on unspecified portions of the shooting range. Metacon's Environmental Stewardship Plan states that "[a] vernal pond is located directly in back of the backstop berm, and wetlands border the range immediately to the North and extend East beyond the berm for approximately 100 yards." J.A. at 211. Further, the District Engineer for the Army Corps of Engineers provided Metacon with a permit to expand its berm in 1990. The permit described the project location as "wetlands adjacent to the Farmington River." *Id.* at 467.

## II. Evidence of Lead Contamination at Metacon

SAPS provided evidence of lead accumulation on Metacon's site based on a SAPS member's non-specific observation of a "tremendous amount of spent ammunition on the ground," *id.* at 596, and Metacon's admission in a related state lawsuit that "[t]housands of pounds of lead are deposited at the Site," *id.* at 696. Meanwhile, Metacon provided evidence that, for at least the last ten years, it has conducted "regular clean-ups," where members rake the range to collect materials such as spent casings and munitions. *Id.* at 503.

Several rounds of expert testing have been performed on Metacon's site. In November 2003, the State of Connecticut Department of Environmental Protection ("CTDEP") indicated that groundwater and surface water samples from the Metacon site exceeded Connecticut's Remediation

Standard Regulation ("RSR") protection criterion for lead in groundwater and surface water. However, given time constraints on the testing and the fact that standard sampling protocol was not followed, CTDEP indicated that the result could be "skewed[,] . . . potentially resulting in higher concentrations of metals parameters." *Id.* at 275. As a result, CTDEP requested that Metacon retain a consultant to resample the monitoring wells and surface water east of the berm using an appropriate sampling methodology, and report back to the Department.

Metacon hired Leggette, Brashears & Graham, Inc. ("LBG"), which provides professional groundwater and environmental engineering services, to conduct the requested testing. In an April 2004 report, LBG found that "the ground water beneath the shooting range has not been impacted by lead from the shooting range," and that, with respect to wetland surface water, "the dissolved lead findings demonstrate that lead is not leaching out of the soil or surface water to contaminate the surface water." *Id.* at 266. In sum, the sampling "demonstrated that the shoo[t]ing activities at the Metacon property [have] not resulted in lead contamination of the ground water or surface water at the Metacon site." *Id.* at 267. Based on this report, the CTDEP concluded that "[a]ll the results indicate[] that lead was not detected or was present at concentrations in groundwater and surface water below action levels." *Id.* at 262.

SAPS disputed these findings with a May 2005 report produced by its own expert, Advanced Environmental Interface, Inc. ("AEI"). Unlike the LBG study, which tested only groundwater and wetland surface water samples, AEI tested soil samples and wetland sediment samples, as well as wetland surface water samples from the range and area surrounding the berm. With respect to soil samples, all samples collected from the backstop berm area, and all but one sample collected from locations between the firing line and berm, contained total lead concentrations that exceeded the

6

CTDEP Direct Exposure Criterion ("DEC") for residential sites, with several samples exceeding the CTDEP Significant Environmental Hazard ("SEH") notification threshold. Some of these samples were subject to a leaching procedure, with results indicating that "the lead is leachable and may over time pose a threat to ground water quality." *Id.* at 643. With respect to wetland sediment samples, the total lead concentration for all samples exceeded the CTDEP DEC for residential sites. As to the wetland surface water samples, the report found different results in filtered and unfiltered samples. As to the unfiltered samples, the total lead concentrations exceeded the CTDEP chronic aquatic life criterion, with some samples exceeding the acute aquatic life criterion. However, the dissolved lead in the filtered samples was non-detect, meaning that the total lead concentrations in the unfiltered samples were likely "the result of either turbidity caused by suspended lead-bearing particles or colloidal matter." *Id.* at 644. The AEI report does not specifically explain the relevance of the distinction between the results from the filtered and unfiltered wetland surface water samples.

The AEI report states that "[s]pent ammunition from typical firing range activities has contaminated various environmental media on the Metacon Gun Club site." *Id.* at 645. Although the report notes that "firing-range-related contaminants on the site . . . represent[] a potential exposure risk to both humans and wildlife," it concludes that "[a] risk assessment utilizing the data obtained during this investigation would be necessary to evaluate the degree of risk to humans and wildlife." *Id.* at 646.

It is undisputed that Metacon does not have a hazardous waste disposal permit under the RCRA, 42 U.S.C. § 6925, or a National Pollutant Discharge Elimination System ("NPDES") permit, which is required for the discharge of pollutants under the CWA, 33 U.S.C. § 1311(a).

**III. Metacon's Environmental Stewardship Plan**

On July 13, 2004, after this litigation commenced, Metacon adopted an Environmental Stewardship Plan. It provides for the annual raking of the range and screening of debris to recover bullets and fragments, as well as the use of "vacuuming machinery rather than hand-raking, and mechanical separation machinery in place of hand screening." J.A. at 214. The Plan also provides for the mining of the berm in the year 2024.

<strong>DISCUSSION</strong>

**I. Standards of Review**

Since SAPS's RCRA permit violation claim is before us on appeal from the grant of a motion to dismiss, with respect to that claim we "accept the facts alleged in the . . . complaint as true." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 180 (2d Cir. 2008). Our review is de novo. *Id.* at 183.

We review the district court's grant of summary judgment on the remaining RCRA and CWA claims de novo, construing the evidence in the light most favorable to the nonmoving party. *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). Summary judgment is warranted only upon a showing by the movant "that there is no genuine issue as to any material fact and that the moving party is entitled to . . . judgment as a matter of law." *Scholastic, Inc. v. Harris*, 259 F.3d 73, 81 (2d Cir. 2001) (quoting Fed. R. Civ. P. 56(c)). When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001). In that event, the nonmoving party must come forward with admissible evidence

8

sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment. *Celotex*, 477 U.S. at 322-23.

**II. RCRA**

**A. Statutory Background**

RCRA is a "comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). "RCRA's primary purpose . . . is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Id.* (quoting 42 U.S.C. § 6902(b)). The statute contains a citizen suit provision, 42 U.S.C. § 6972, "which permits private citizens to enforce its provisions in some circumstances." *Id.* at 484.

SAPS pursues two claims under the RCRA citizen suit provision. First, 42 U.S.C. § 6972(a)(1)(A) permits a civil action against any person "who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter." In its permitting violation claim, SAPS alleges that Metacon is operating a facility for the disposal of hazardous waste without the requisite permit, in violation of 42 U.S.C. § 6925(a). Second, 42 U.S.C. § 6972 (a)(1)(B) permits a civil action against any person "who has contributed or who is contributing to the past or present . . . disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." SAPS claims that lead munitions are being disposed of on Metacon's site and that this "may present an imminent and substantial endangerment," triggering liability under 42 U.S.C. §

6972(a)(1)(B).[1]

RCRA defines solid waste as "any garbage . . . and other *discarded material . . .* resulting from industrial, commercial, mining, and agricultural operations, and from community activities." 42 U.S.C. § 6903(27) (emphasis added). In order for waste to be classified as hazardous under RCRA, "it must first qualify as a solid waste" pursuant to the statute. *Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1313 (2d Cir. 1993); *see also* 42 U.S.C. § 6903(5) ("The term 'hazardous waste' means a solid waste [that also has additional characteristics.]"). As a threshold matter, because SAPS's permitting violation claim is based on the disposal of hazardous waste and its "imminent and substantial endangerment" claim requires the disposal of solid *or* hazardous waste, both claims require a finding that the spent munitions and their remains accumulating on Metacon's site constitute a solid waste under the RCRA.

We have recognized that "RCRA regulations create a dichotomy in the definition of solid waste," *Conn. Coastal*, 989 F.2d at 1314, so that a different definition applies to permitting violation claims than to claims of "imminent and substantial endangerment." With regard to the latter, 40 C.F.R. § 261.1(b)(2)(ii) provides that the statutory definition of solid waste in 42 U.S.C. § 6903(27)

---

[1] Although SAPS's appellate brief also states that SAPS "claims that the Gun Club has engaged in open dumping of a hazardous waste in violation of RCRA, 42 U.S.C. § 6945," Appellants' Br. 12, this is SAPS's only mention of an open dumping claim. SAPS fails even to reference the federal regulations regarding "open dumping" in violation of 42 U.S.C. § 6945(a). *See* 40 C.F.R. § 257.1(a). Thus, we consider SAPS's open dumping claim to be abandoned. *See United States v. Joyner*, 313 F.3d 40, 44 (2d Cir. 2002) ("It is well established that an argument not raised on appeal is deemed abandoned and lost, and that a court of appeals will not consider the argument unless it has reason to believe that manifest injustice would result otherwise." (internal quotation marks omitted)); *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

10

(in relevant part, that solid waste is "any garbage . . . and other discarded material . . . resulting from . . . community activities") "applies to 'imminent hazard' lawsuits brought by the United States under . . . 42 U.S.C. § 6973." *Conn. Coastal*, 989 F.2d at 1314. Because the language of the "imminent and substantial endangerment" citizen suit provision is "nearly identical" to the provision governing suit by the United States, *id.* at 1315, we have held that the "statutory definition of solid waste applies to citizen suits brought to abate imminent hazard to health or the environment," *Id.*; *cf.* 42 U.S.C. § 6972(a)(1)(B) (citizen suit provision); *id.* § 6973(a) (government suit provision).

The definition of solid waste in the RCRA regulations governing permitting violations and other related matters "is narrower than its statutory counterpart." *Conn. Coastal*, 989 F.2d at 1314; *see also Military Toxics Project v. EPA* , 146 F.3d 948, 951 (D.C. Cir. 1998) ("Although the EPA has narrowed the definition of solid waste for purposes of Subtitle C, the statute itself still provides the relevant definition for purposes of Subtitle G, which authorizes the Administrator (§ 7003) – or, indeed, 'any person' (§ 7002(a)(1)(B)) – to bring suit in order to force such action as may be necessary to abate 'an imminent and substantial endangerment to health or the environment' caused by solid waste." (quoting 42 U.S.C. §§ 6972(a)(1)(B), 6973)); *Owen Elec. Steel Co. of S.C., Inc. v. Browner*, 37 F.3d 146, 148 n.3 (4th Cir. 1994) ("[T]he statutory definition of 'solid waste' . . . is *broader* than the regulatory definition.") (citing *Conn. Coastal*, 989 F.2d at 1315).  As this Court said in *Connecticut Coastal*, these "regulations define solid waste as 'any discarded material' and further define discarded material as that which is 'abandoned.' Materials that are abandoned have been 'disposed of.'" 989 F.2d at 1314 (citations omitted) (quoting 40 C.F.R. § 261.2). This narrower definition of solid waste "applies . . . to wastes that also are hazardous for purposes of the regulations implementing Subtitle C of RCRA." 40 C.F.R. § 261.1(b)(1). Subtitle C includes 42 U.S.C. §

11

6925(a), the hazardous waste permitting provision pursuant to which SAPS initiated its permitting claim.

Concluding that the "[d]ual definitions of solid waste are suggested by the structure and language of RCRA," and that the regulations promulgated by the Environmental Protection Agency ("EPA") "reasonably interpret the statutory language," we have accorded deference to the EPA's dichotomous regulatory definition of solid waste pursuant to *Chevron v. Natural Res. Def. Council*, 467 U.S. 837 (1984). *Conn. Coastal*, 989 F.2d at 1315. Accordingly, SAPS's 42 U.S.C. § 6925(a) claim that Metacon is disposing of hazardous waste without a permit is governed by the narrower regulatory definition of solid waste, while SAPS's 42 U.S.C. § 6972 (a)(1)(B) "imminent and substantial endangerment" claim is governed by the broader statutory definition in 42 U.S.C. § 6903(27).

**B. The Permitting Claim**

SAPS claims that Metacon is operating a hazardous waste disposal facility without a permit in violation of 42 U.S.C. § 6925(a). Hazardous waste within the meaning of 42 U.S.C. § 6925(a) must meet the narrower regulatory definition of solid waste. Thus, to prevail, SAPS must allege and prove that the lead deposited on the Metacon site is a "discarded material," 42 U.S.C. § 6903(27), which 40 C.F.R. § 261.2(a)(2)(i)(A) defines in relevant part as any material which is "abandoned" by being "[d]isposed of" or by being "[a]ccumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of." 40 C.F.R. § 261.2(b). SAPS argues that the maintenance of a shooting range where lead shot accumulates involves "discarded material" within the meaning of the RCRA permitting regulations.

The district court dismissed this claim pursuant to Fed. R. Civ. P. 12(b)(6). The court noted

that the EPA took the position in *amicus* briefs in both *Connecticut Coastal* and *Long Island Soundkeeper Fund, Inc. v. N.Y. Athletic Club*, No. 94 Civ. 0436 (RPP), 1996 WL 131863 (S.D.N.Y. Mar. 22, 1996), that the ordinary use of lead shot on a shooting range does not fall within the regulatory definition of solid waste because "[s]pent rounds of ammunition and target fragments are not . . . 'discarded material' within the meaning of the regulation, because they have not been 'abandoned,' . . . [but] come to rest on land . . . as a result of their proper and expected use." *Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc.*, No. 3:04 Civ. 803 (JBA), 2005 WL 1413183, at *5 (D. Conn. June 14, 2005). The court observed further that the EPA's guidance manual, Best Management Practices for Lead at Outdoor Shooting Ranges, published in 2001, states that "[l]ead shot is not considered a hazardous waste subject to RCRA at the time it is discharged from a firearm because it is used for its intended purpose. As such, shooting lead shot (or bullets) is not regulated *nor is a RCRA permit required* to operate a shooting range." *Id.* (quoting EPA Doc. No. EPA-902-B-01-001). The court concluded that the EPA's interpretation of its regulations was reasonable and entitled to deference. *Id.* at *6.

In response to a request from this Court, the United States has submitted an *amicus* brief addressing whether lead shot discharged at a shooting range falls within the regulatory definition of solid waste set forth in 40 C.F.R. § 261.2. The United States maintains that the "EPA . . . has consistently taken the position that the discharge of lead shot as part of the normal use of that product (i.e., being fired from a gun at a firing range) does not render the materials 'discarded' within the meaning of the RCRA subtitle C permitting regulations under 42 U.S.C. § 6925(a)," and further that the "EPA has repeatedly stated that its regulatory jurisdiction under RCRA does not apply to products that are applied to the land in the ordinary manner of use, because such products are being

13

used, not 'abandoned.'" United States Supp. Amicus Br. 5-6.

We conclude that this interpretation of 40 C.F.R. § 261.2 by the EPA is entitled to deference. *See Auer v. Robbins*, 519 U.S. 452, 462 (1997). The regulation is ambiguous as to whether lead shot discharged into a shooting range's berm, or the range itself, constitutes "discarded material." A person shooting a gun into a berm clearly knows that his spent ammunition will remain there unless removed. But has he therefore discarded it? Or has he instead merely used the ammunition in its intended manner, with the result that it is left on the land? The text of 40 C.F.R. § 261.2 provides no definitive answer.

In such circumstances we will generally defer to an agency's interpretation of its own regulations, including one presented in an *amicus* brief, so long as the interpretation is not plainly erroneous or inconsistent with law. *See Roth ex rel. Beacon Power Corp. v. Perseus, LLC,* 522 F.3d 242, 247-48 (2d Cir. 2008); *see also Linares Huarcaya v. Mukasey*, 550 F.3d 224, 229 (2nd Cir. 2008) ("*Auer* deference . . . is warranted only when the language of the regulation is ambiguous." (internal quotation marks omitted)); *Am. Fed'n of State, County & Mun. Employees v. Am. Int'l Group, Inc.,* 462 F.3d 121, 126 (2d Cir. 2006) (noting that "while agency interpretations that lack the force of law do not warrant deference when they interpret ambiguous *statutes*, they do normally warrant deference when they interpret ambiguous *regulations*"); *M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.*, 432 F.3d 127, 139 (2d Cir. 2005) ("To the extent that the *amicus* brief is interpreting the agency's own regulations, as it is here, it is entitled to deference under *Auer*, 519 U.S. 452, as long as the regulation is ambiguous.").

Here, the agency reasonably determined that lead shot put to its ordinary, intended use, i.e., discharged at a shooting range, is neither "material which is . . . abandoned by being . . . [d]isposed

14

of," nor "[a]ccumulated . . . before or in lieu of being abandoned by being disposed of." 40 C.F.R. § 261.2(a)(2)(i), (b). The EPA's distinction between "abandonment" of lead shot, which falls within the regulatory definition of solid waste, and the normal, intended use of lead shot at a shooting range, which does not, is consistent with related RCRA regulations. For example, 40 C.F.R. § 261.2(c)(ii) provides that certain "commercial chemical products . . . are not solid wastes if they are applied to the land and that is their ordinary manner of use." Similarly, "[a] military munition is not a solid waste when . . . [u]sed for its intended purpose," while an "unused military munition is a solid waste when . . . [t]he munition is abandoned by being disposed of." 40 C.F.R. § 266.202(a), (b); *see also Military Toxics Project*, 146 F.3d at 952 ("The Military Munitions Rule provides that a military munition that lands on a firing range is not a solid waste and hence cannot be a hazardous waste for purposes of Subtitle C."). More generally, the EPA's position that materials put to their ordinary, intended use are not "abandoned" under the regulatory definition of solid waste, and hence are not subject to the permitting requirements of 42 U.S.C. § 6925(a), is consistent with the RCRA. As this Court has recognized, the words of the statute "contemplate that the EPA would refine and narrow the definition of solid waste," *Conn. Coastal*, 989 F.2d at 1315, for the purpose of the more stringent regulatory treatment afforded to hazardous wastes in Subchapter III, where the permitting provisions are located. The EPA's interpretation of its regulations – excluding from the more stringent permitting requirements of § 6925(a) those materials deposited on the land as part of their intended use – does just that.

We also note the consistency of the EPA's interpretation of 40 C.F.R. § 261.2 over time. *See Auer*, 519 U.S. at 462 (observing that an agency's interpretation of a regulation contained in a legal brief was entitled to deference where it was "in no sense a '*post hoc* rationalization' advanced by

15

an agency seeking to defend past agency action against attack" and there was no reason to suspect the interpretation did not reflect "the agency's fair and considered judgment on the matter in question"). The EPA took the position that lead munitions discharged at a shooting range do not fall within the regulatory definition of solid waste in an *amicus* brief to this Court in *Connecticut Coastal*, 989 F.2d at 1315, decided in 1993, and again in an *amicus* brief to a district court in *Long Island Soundkeeper Fund, Inc.,* 1996 WL 131863 at *8-9, decided in 1996. Furthermore, in the "Best Management Practices" manual the EPA makes clear that while spent lead shot left in the environment "is subject to the broader definition of solid waste" employed elsewhere in the RCRA, "[l]ead shot is not considered a hazardous waste subject to RCRA at the time it is discharged from a firearm . . . nor is a RCRA permit required to operate a shooting range." J.A. at 129.

SAPS argues that "[e]ven if it is determined that the act of shooting may not require a RCRA permit . . . the maintenance of a site where shot accumulates should." Appellants' Br. 14. However, the EPA's interpretation is that the nature of a material's use, not the length of time it lies unrecovered, determines whether the regulatory definition of solid waste applies. *See* United States Supp. Amicus Br. 9 ("EPA has interpreted its regulations to mean that, when lead shot falls on a gun range as part of the normal use of the range, RCRA Section 6925(a) permit requirements do not arise by the mere passage of time."). We defer to the EPA's interpretation of 40 C.F.R. § 261.2. Because the lead on Metacon's site was not abandoned but is the result of the regular, intended use of lead shot at a shooting range, Metacon was not required to obtain a permit under 42 U.S.C. § 6925(a). Accordingly, SAPS's permitting claim, which is premised on such a requirement, was properly dismissed.

**C. The Imminent and Substantial Endangerment Claim**

SAPS's next claim is that Metacon has disposed of solid waste, i.e., the lead that has been "discarded" on its site, 42 U.S.C. § 6903(27), that "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). The district court granted Metacon summary judgment on the ground that SAPS provided insufficient evidence that solid waste had been "discarded" on the Metacon site in light of Metacon's uncontested evidence that spent casings and munitions are periodically removed. *Simsbury-Avon Pres. Soc'y v. Metacon Gun Club*, No. 3:04 Civ. 803(JBA), 2006 WL 2223946, at *9 (D. Conn. Aug. 2, 2006).

We need not reach the issue of whether lead on Metacon's site has been "discarded" within the meaning of the statutory definition of solid waste. *See Conn. Coastal*, 989 F.2d at 1316 ("RCRA regulations apply the broader statutory definition of solid waste to imminent hazard suits."). Metacon argues that, assuming *arguendo* that lead is discarded on its site, the district court's grant of summary judgment should be affirmed on the alternative ground that there is insufficient evidence that the discarded lead constitutes a "solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). This standard cannot be met as a matter of law, says Metacon, because the AEI report on which SAPS relies concedes that the "degree of risk to humans and wildlife" cannot be assessed without further investigation, which SAPS has not undertaken. J.A. at 646. SAPS responds that the AEI report's findings are sufficient to raise a material issue of fact as to whether the spent ammunition on the site "may" present an "imminent and substantial endangerment." For the reasons stated here, we conclude that the AEI report does not raise a material issue of fact and that summary judgment was properly granted.

**1. Imminent and Substantial Endangerment Standard**

The RCRA citizen suit provision, 42 U.S.C. § 6972(a)(1)(B), provides a cause of action

> against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B). The RCRA defines "disposal" as the "discharge, deposit, . . . or placing

of any solid waste or hazardous waste into or on any land or water so that such solid waste or

hazardous waste or any constituent thereof may enter the environment or be . . . discharged into any

waters." 42 U.S.C. § 6903(3).

We have indicated that the "imminent and substantial endangerment" standard is a broad one:

> Significantly, congress used the word "may" to preface the standard of liability: "present an imminent and substantial endangerment to health or the environment[.]" This is expansive language, which is intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes.

*Dague v. City of Burlington*, 935 F.2d 1343, 1355 (2d Cir. 1991) (internal quotation marks and

citations omitted), *judgment rev'd in part on other grounds*, 505 U.S. 557 (1992); *see also Me.*

*People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 288 (1st Cir. 2006) (noting that "at least four

of our sister circuits have construed [§ 6972(a)(1)(B)] expansively" and that "all four courts have

emphasized the preeminence of the word 'may' in defining the degree of risk needed to support [§

6972(a)(1)(B)'s] liability standard"). No matter how broadly read, however, the text of 42 U.S.C. §

6972 requires the presence of solid or hazardous waste that may present an "endangerment" that is

"imminent" and "substantial." Each of these terms benefits from evaluation.

In *Dague*, we stated that "imminency" requires a showing that a "risk of threatened harm is

18

present." *Dague*, 935 F.3d at 1356; *see also Meghrig*, 516 U.S. at 485-86 (imminency requires "a threat which is present *now*, although the impact of the threat may not be felt until later"); *Me. People's Alliance*, 471 F.3d at 296 (imminency requires a "reasonable prospect of future harm . . . [that] is near-term"); *Chem. Weapons Working Group, Inc. v. U.S. Dep't of Def.*, 61 Fed. App'x 556, 561 (10th Cir. 2003) ("A vague possibility of future harm cannot satisfy [42 U.S.C. § 6972(a)(1)(B)], which applies to dangers that are both imminent and substantial."(internal quotation marks omitted)); *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994) ("A finding of 'imminency' does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present."). Nonetheless, liability under 42 U.S.C. § 6972(a)(1)(B) is not "limited to emergency-type situations," and "[a] finding of 'imminency' does not require a showing that actual harm will occur immediately." *Dague*, 935 F.2d at 1356. "An 'imminent hazard' may be declared at any point in a chain of events which may ultimately result in harm to the public." *Id.* (internal quotation marks omitted).

As for the requirement that the endangerment at issue be "substantial" – a term for which the RCRA provides no definition or explanation, and that we did not specifically comment on in *Dague* – we agree with other Circuits that have concluded that an endangerment is "substantial" if it is serious. *See Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1021 (10th Cir. 2007) ("[A]n endangerment is substantial under RCRA when it is serious." (internal quotation marks omitted)); *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1015 (11th Cir. 2004) ("Because the operative word [in 42 U.S.C. § 6972(a)(1)(B)] is 'may,'. . . the plaintiffs must show that there is a potential for an imminent threat of a serious harm."); *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 259 (3d Cir. 2005) (stating that *Parker*'s "approach . . . is most faithful to the statutory language, especially as to the word 'substantial'"); *Cox v. City of Dallas*, 256 F.3d 281, 300 (5th Cir. 2001)

("[A]n endangerment is 'substantial' if it is 'serious.'"); *Price*, 39 F.3d at 1019 ("[The] endangerment must be substantial or serious."). This interpretation comports with the ordinary meaning of "substantial," which includes "being of moment," or "important." Webster's Third New International Dictionary 2281 (2002). Although "the courts have agreed that the word 'substantial' implies serious harm," there has "been some reluctance to quantify the needed level of harm more precisely," *Me. People's Alliance*, 471 F.3d at 288, and we decline to do so here. *See Burlington N. & Santa Fe Ry. Co.*, 505 F.3d at 1021 (stating that a showing of serious endangerment "does not necessitate quantification of endangerment").

As for endangerment, "[c]ourts have consistently held that 'endangerment' means a threatened or potential harm and does not require proof of actual harm." *Dague*, 935 F.2d at 1356. An endangerment that is "imminent and substantial" requires a "reasonable prospect of future harm." *Me. People's Alliance*, 471 F.3d at 296; *see also Burlington N. & Santa Fe Ry. Co.*, 505 F.3d at 1021 (stating that "an endangerment is substantial where there is *reasonable cause for concern* that someone or something may be exposed to risk of harm" (emphasis added)); *Interfaith Cmty. Org.*, 399 F.3d at 259 (same). As the First Circuit recently summarized: "[T]he combination of the word 'may' with the word 'endanger,' both of which are probabilistic, leads us to conclude that a reasonable prospect of future harm is adequate to engage the gears of [§ 6972(a)(1)(B)] so long as the threat is near-term and involves potentially serious harm." *Me. People's Alliance*, 471 F.3d at 296.

**2. SAPS's Evidence**

Pointing to the AEI report, SAPS argues that it has adduced sufficient evidence to create a material issue of fact as to whether lead contamination on Metacon's site "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). We disagree

20

for at least two reasons. Specifically, SAPS has failed to adduce sufficient evidence on either of two issues: (1) the likelihood that existing lead contamination will in fact result in harm to human health or the environment; and (2) the severity of any harm that might occur.

With respect to the first issue, SAPS's expert report states that the "degree of potential exposure" of humans and wildlife to lead contamination on the site – with respect to impacted soils, wetland surface water and wetland sediment – was not assessed. J.A. at 644-45. The report concludes as follows: "The presence of firing-range-related contaminants on the site, primarily total lead, represents a *potential exposure risk* to both humans and wildlife. A risk assessment utilizing the data obtained during this investigation would be necessary to evaluate the *degree of risk* to humans and wildlife." *Id.* at 646 (emphasis added). SAPS never undertook such a risk assessment. The record is thus insufficient to permit a factfinder to assess the magnitude of the possible risk identified in the AEI report – a risk, parenthetically, that was not detected at all in the analysis performed by LGB. There is thus insufficient evidence for a jury to find that the alleged contamination presents a reasonable prospect of future harm, and hence that it "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B); *see also Birch Corp. v. Nev. Inv. Holding, Inc.*, 152 F.3d 924, No. 97-55282, 1998 WL 442982, at *2 (9th Cir. June 29, 1998) (unpublished opinion) (letter stating the "product [,i.e., gasoline,] may pose a significant threat to public health/safety" was found to be insufficient to create a material issue of fact regarding imminent and substantial endangerment because the letter "makes no statement about the imminence of these harms" and indicates merely a "possible substantial endangerment to the public health").

The second concern arises from the failure of SAPS's proffered evidence to raise an issue of fact as to the seriousness of the risk it alleges. SAPS points to evidence in the AEI report that soil,

wetland sediment and wetland surface water samples indicate the presence of lead at levels exceeding various Connecticut regulatory standards for residential sites. Even assuming *arguendo* that "[p]roof of contamination in excess of state standards may support a finding of liability, and may alone suffice for liability in some cases," *Interfaith Cmty. Org.*, 399 F.3d at 261, however, the record in this case is insufficient for a reasonable jury to find that the lead contamination at issue here "involves potentially serious harm." *Me. People's Alliance*, 471 F.3d at 296.

The AEI report compares the result of samples taken from the Metacon site to "risk-based and health-based criteria developed by CTDEP." J.A. at 641. The report states:

> Soil sample laboratory test results for total lead and other metals are compared to Direct Exposure Criteria (DEC) of the CTDEP Remediation Standard Regulations (RSRs) and to CTDEP Significant Environmental Hazard (SEH) notification thresholds specified in Connecticut General Statutes (C.G.S.) 22a-6u. RSR DEC are health-based standards developed by CTDEP to be protective of human health and are used in this report by AEI as guidelines to assess the potential risk to human health via long-term exposure (i.e., skin contact, ingestion, inhalation, etc.) to constituents in the soil. SEH thresholds are criteria developed by CTDEP to identify potentially significant hazards to human health and the environment.

*Id.* The report finds that various samples drawn from the Metacon site exceeded Connecticut's RSR and SEH thresholds for residential sites, and draws the conclusion that lead contamination on the site presents "a potential exposure risk to both humans and wildlife." *Id.* at 646.

The report notes specifically, however, in the section labeled "Exposure Assessment," that evaluation of the degree of such risk would require a further risk assessment. *See* J.A. 644-45. Because it did not undertake this assessment, SAPS relies solely on the conclusion that certain samples from the Metacon site exceeded Connecticut's RSR and SEH standards to support the claim that lead on the site presents a potentially serious risk.

This is plainly insufficient to raise a material issue. At the start, state environmental standards

22

"do not define a party's federal liability under RCRA." *Interfaith Cmty. Org.*, 399 F.3d at 261 n.6. Even the most cursory review of Connecticut law, moreover, strongly suggests that the mere fact that some samples taken from the Metacon site may exceed Connecticut's RSR standards provides an insufficient basis for a jury to find a reasonable prospect of future harm that is both "near-term and . . . potentially serious." *Me. People's Alliance*, 471 F.3d at 296. Connecticut's RSR standards define, *inter alia*, the threshold levels to which contaminated sites must be remediated in circumstances where the CTDEP has determined remediation is necessary. *See* Conn. Agencies Regs. §§ 22a-133k-1(b); 22a-133k-2(a). Notably, however, the RSRs "do not create in and of themselves a requirement that remediation be undertaken, nor do they specify a time-frame for completing remediation." Conn. Dep't of Envtl. Prot., Remediation Standard Regulations: An Environmental Program Fact Sheet (updated Aug. 2007), *available at* http://www.ct.gov/Dep/cwp/view.asp?a=2715&q=325014&depNav_GID=1626. With regard to hazardous waste disposal sites, for example, to which the RSRs apply, Connecticut law authorizes the CTDEP to undertake a site assessment and to order remedial action on the basis of this assessment. *See* Conn. Gen. Stat. §§ 22a-133d, 22a-133e. Remediation to the DEC threshold is not required merely because this threshold has been exceeded, but in light of the agency's consideration of a range of risk factors, including the characteristics of hazardous substances, such as their mobility and toxicity, the likelihood that these substances will be released, and the nature of potentially threatened populations or environments.[2] *See* Conn. Gen. Stat. § 22a-133d (specifying required

---

[2]The RSRs are also relevant to claims brought under the Connecticut Environmental Protection Act ("CEPA"), Conn. Gen. Stat. § 22a-14 et seq., which authorizes citizens to sue for declaratory and injunctive relief from "unreasonable pollution, impairment or destruction" of "the air, water and other natural resources of the state." Conn. Gen. Stat. § 22a-16; *see also Fort Trumbull Conservancy, LLC v. Alves*, 262 Conn. 480, 509 (2003). There is authority for the

elements in a site assessment, including "a score developed by using the uncontrolled hazardous waste site ranking system found in the Code of Federal Regulations, Title 40, Section 300, Appendix A, as amended"); *Honeywell Int'l, Inc. v. EPA*, 372 F.3d 441, 444 (D.C. Cir. 2004) (describing considerations employed in ranking hazardous waste sites).

The AEI report says that it employs the DEC thresholds "as guidelines to assess the potential risk to human health via long-term exposure (i.e., skin contact, ingestion, inhalation, etc.) to constituents in the soil." J.A. at 641. Yet SAPS has provided no evidence that anyone is subject to long-term exposure to lead contamination at the Metacon site, or that there are realistic pathways of exposure there. Indeed, the report found that none of the soil samples drawn from the firing line, where most people at the club would presumably be located while there, exceeded these thresholds. J.A. at 642-43.

As to the AEI report's finding that various samples exceeded the SEH notification threshold, this finding, too, provides a wholly inadequate basis, standing alone, to support a reasonable

---

proposition that the release of contaminants above the RSR thresholds constitutes prima facie evidence of unreasonable pollution under the CEPA. *See Durham Mfg. Co. v. Merriam Mfg. Co.*, 294 F. Supp. 2d 251, 271 (D. Conn. 2003); *50 Day Str. Assocs. v. Norwalk Hous. Auth.*, No. X08 Civ. 020191396S, 2005 WL 1394772, at *11 (Conn. Super. Ct. May 17, 2005). Notably, however, SAPS brought a CEPA claim against Metacon, relying in part on the AEI evaluation, and failed to establish a prima facie case. *See Simsbury-Avon Pres. Soc'y, LLC v. Town of Simsbury*, No. X01 Civ. 044001892S, 2008 WL 853625, at *9 (Conn. Super. Ct. March 13, 2008) ("Overall, the plaintiff has provided scant evidence in support of its claim that Metacon has unreasonably polluted a natural resource of the state by operating its shooting range. Its evidence might suggest the need for more sampling and testing, but at this stage it is insufficient to construct a prima facie case."); *id.* at *8 (finding that SAPS "has not explained why the RSRs should apply to Metacon in the first place," and "[e]ven if the RSRs do apply to Metacon, it is unclear whether the residential or industrial/commercial RSRs should apply to soil samples taken from the property").

24

factfinder's conclusion that the lead at Metacon presents an imminent and substantial endangerment. Conn. Gen. Stat. § 22a-6u imposes a requirement that (1) if "a technical environmental professional" determines that there is "pollution of soil within two feet of the ground surface [that] contains a substance" in excess of the applicable SEH threshold, the professional must notify the owner of the contaminated parcel within seven days, Conn. Gen. Stat. § 22a-6u(d)(1); and (2) the "owner of the subject parcel shall notify the commissioner [of the CTDEP] in writing" within ninety days, unless, *inter alia*, the soil is remediated so that the contaminant does not exceed the pertinent direct exposure criterion. *Id.* § 22a-6u(d)(2). Standing alone, however, the fact that some Metacon samples triggered this notification requirement does not support the conclusion that the site is contaminated so as to pose a potentially serious risk of harm for the purpose of the federal standard articulated in § 6972(a)(1)(B). Indeed, CTDEP states that, when it receives notification of the presence of a contaminant above the SEH level, the "DEP may . . . indicate, if appropriate, that no additional action is required to abate the hazard condition identified in the notification." Conn. Dep't of Envtl. Prot., Environmental Program Fact Sheet: Reporting of Significant Environmental Hazards 3 (Nov. 2, 2004), available *at* http://www.ct.gov/dep/lib/dep/site_clean_up/hazard_notification/faq_report_haz.pdf.[3]

---

[3]The AEI report also indicates that unfiltered samples drawn from wetland surface water behind the berm exceed Connecticut's acute aquatic life criterion. In specified circumstances, Connecticut law imposes a requirement that the CTDEP be notified when this criterion is exceeded and ground water has been contaminated. *See* Conn. Gen. Stat. § 22a-6u(g)(1). The AEI report, however, provides no evidence of ground water contamination nor does it otherwise explain the significance of its finding regarding surface water samples, noting that while "[w]ildlife exposure would . . . be expected to occur via direct contact with or ingestion of affected wetland surface water . . . [t]he degree of potential exposure cannot be assessed herein." J.A. at 645. Since SAPS does not even mention the aquatic life criterion in its RCRA briefing, moreover, any argument that a material issue exists by virtue of this criterion having been exceeded has not been preserved for our review. *Norton*, 145 F.3d at 117.

In sum, evidence that certain samples taken from the Metacon site exceeded Connecticut's RSR and SEH standards simply provides an inadequate basis for a jury to conclude that federal law, specifically, § 6972(a)(1)(B), has been violated. Absent additional evidence, the mere fact that SAPS has produced such samples does not support a reasonable inference that Metacon's site presents an imminent and substantial endangerment. We emphasize that we do not hold that exceeding Connecticut's RSR and SEH standards can never be relevant to a determination of whether a risk is potentially serious under the RCRA, but rather that the evidence in this case, standing alone, is insufficient to create a material issue of fact as to whether lead contamination on Metacon's site may present an imminent and substantial endangerment.

We conclude that SAPS's evidence (1) does not indicate anything more than a speculative prospect of future harm and (2) does not include sufficient information from which a reasonable jury could find that the potential harm at issue rises to the level of a serious endangerment. Hence, SAPS has failed to raise a material issue of fact as to whether lead contamination at Metacon's site "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Accordingly, the district court's grant of summary judgment to Metacon on SAPS's RCRA "imminent and substantial endangerment" claim is affirmed.

**III. CWA**

**A. Statutory Background**

The objective of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA "is the principal legislative source of the EPA's authority – and responsibility – to abate and control water pollution." *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486, 491 (2d Cir. 2005). The CWA "formally prohibits the 'discharge

of a pollutant' by 'any person' from any 'point source' to navigable waters except when authorized by a permit issued under the National Pollutant Discharge Elimination System ('NPDES')." *Id.*; *see also* 33 U.S.C. §§ 1311(a), 1342. SAPS claims that Metacon is discharging pollutants without the required NPDES permit.

The CWA provision at issue here, 33 U.S.C. § 1311(a), provides that "the discharge of any pollutant by any person shall be unlawful," "[e]xcept as in compliance" with other provisions of the statute, including the NPDES permit requirement in 33 U.S.C. § 1342. The key phrase "discharge of any pollutant" is "defined broadly," *Rapanos v. United States*, 547 U.S. 715, 723 (2006), to mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "'[P]ollutant' is defined to include not only traditional contaminants but also solids such as 'dredged soil, . . . rock, sand, [and] cellar dirt,'" *Rapanos*, 547 U.S. at 723 (quoting 33 U.S.C. § 1362(6) (second alteration in original)), as well as munitions. The term "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, [or] rolling stock . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The term "navigable waters" means "the waters of the United States, including the territorial seas." *Id.* § 1362(7).

The district court granted summary judgment to Metacon on the ground that SAPS failed to provide sufficient evidence that Metacon is discharging lead into "navigable waters," i.e., jurisdictional wetlands, under the standard set forth in *Rapanos*. *Simsbury-Avon Pres. Soc'y, LLC, v. Metacon Gun Club, Inc.*, 472 F. Supp. 2d 219, 229-30 (D. Conn. 2007). On appeal, Metacon argues for affirmance, *inter alia*, on the alternative ground that SAPS has failed to provide sufficient evidence to create a material issue of fact as to whether the pollutant in this case, i.e., lead munitions,

27

is discharged into navigable waters from a "point source." *See* 33 U.S.C. § 1362(12) ("The term 'discharge of a pollutant' . . . means . . . any addition of any pollutant to navigable waters from any point source."). SAPS responds that there is sufficient evidence for a reasonable jury to conclude that both the shooting range and the berm are point sources that discharge lead into navigable waters. We need not pass on the issue whether wetlands on the Metacon site are jurisdictional under *Rapanos*. Instead, we affirm on the ground that, even assuming the presence of jurisdictional wetlands, SAPS has failed to adduce sufficient evidence to raise a material issue of fact as to whether Metacon discharges lead into such wetlands from a point source.

**B. Navigable Waters**

Though we need not decide whether wetlands on the Metacon site are jurisdictional wetlands pursuant to the *Rapanos* test, some analysis regarding the location of any wetlands on the site is necessary to address the "point source" question. SAPS provides evidence of lead contamination based on samples drawn from three locations on the Metacon site: (1) soil between the shooting range firing line and the berm; (2) soil in the berm; and (3) wetland sediment and surface water within fifty feet of the berm, to the north and east. For discharges into these locations to constitute CWA violations, the locations must constitute "navigable waters."

Navigable waters in the CWA are defined as "the waters of the United States." 18 U.S.C. § 1362(7). The EPA and the United States Army Corps of Engineers ("Corps") have issued substantially equivalent regulations defining "waters of the United States." *See* 40 C.F.R. § 230.3(s) (EPA definition); 33 C.F.R. § 328.3(a) (Corps definition). These waters encompass traditionally navigable waterways, including, *inter alia*, "[a]ll waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce," and their "[t]ributaries." 40

C.F.R. § 230.3(s)(1), (5). Waters also include "[w]etlands adjacent to [jurisdictional] waters (other than waters that are themselves wetlands)," *id*. § 230.3(7), provided that these wetlands "are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas." *Id*. § 230.3(t). The Corps' 1987 Wetland Delineation Manual

> interprets this definition of wetlands to require: (1) prevalence of plant species typically adapted to saturated soil conditions, determined in accordance with the United States Fish and Wildlife Service's National List of Plant Species that Occur in Wetlands; (2) hydric soil, meaning soil that is saturated, flooded, or ponded for sufficient time during the growing season to become anaerobic, or lacking in oxygen, in the upper part; and (3) wetland hydrology, a term generally requiring continuous inundation or saturation to the surface during at least five percent of the growing season in most years.

*Rapanos*, 547 U.S. at 761 (Kennedy, J., concurring); *see also* United *States v. Banks*, 115 F.3d 916, 920 (11th Cir. 1997) ("A 'wetland' under the CWA must meet the three criteria set out in the Corps' 1987 *Wetlands Delineation Manual*: (1) a prevalence of hydrophytic plants, (2) hydrological conditions suited to such plants, and (3) the presence of hydric soils."); *United States v. Malibu Beach, Inc.*, 711 F. Supp. 1301, 1307 (D.N.J. 1989) ("Several courts have recognized the three-parameter approach as an appropriate method to determine whether an area is a wetland.").[4]

Metacon argues that neither the berm nor the shooting range constitute wetlands under this definition. Appellees' Supp. Br. 3. After a careful review of the record, we conclude that while SAPS

---

[4]The Corps' 1987 Wetlands Delineation Manual states that it "only provides a basis for determining whether a given area is wetland for purposes of Section 404" of the CWA, J.A. at 495, under which the Corps issues permits for the discharge of dredged or fill material. *See* 33 U.S.C. § 1344. Because the EPA regulations use the same definition of wetland, however, the Corps' 1987 Wetlands Delineation Manual is helpful in identifying wetlands subject to the NPDES permit requirement.

has proffered limited evidence that some portion of the shooting range may be wetlands, it has failed to raise a material issue of fact as to whether the berm or the *entire* shooting range constitutes a jurisdictional wetland under the CWA.

As to the berm itself, SAPS does not seriously contend, and the record does not demonstrate, that the berm is a jurisdictional wetland. There is evidence that when Metacon expanded its berm in 1990, it needed a permit because Metacon filled a portion of the shooting range that was wetland. But this is insufficient to render the berm a wetland. The "Project Description" of Metacon's permit for filling wetlands states: "Placement of approximately 970 cubic yards of clean fill material in approximately .03 acres of wetland to expand an existing berm on the property of the Metacon Gun Club." J.A. at 467. The permit further indicates that "0.03 of an acre of wetland is proposed to be filled" for the project. *Id.* at 471. Although this indicates that the berm occupies at least some land that formerly constituted wetland, that land has since been filled. The Corps has interpreted the regulatory definition of "wetland" to mean that there is no CWA "jurisdiction over those areas that once were wetlands and part of an aquatic system, but which, in the past, have been transformed into dry land for various purposes." Army Corps of Eng'rs Regulatory Guidance Letter No. 86-9 (Aug. 27, 1986) ("Clarification of 'Normal Circumstances' in the Wetland Definition"), *reprinted in* William Want, *Law of Wetlands Regulation* app. 8 (updated May 2009). Furthermore, "an agency's interpretations [of its own regulations] are . . . entitled to deference and are controlling unless plainly erroneous or inconsistent with the regulation," *Linares Huarcaya*, 550 F.3d at 229, which is clearly not the case here. Thus, the fact that the berm was expanded onto land constituting a wetland by filling the wetland does not make the berm itself a wetland.

As to the shooting range, SAPS also lacks sufficient evidence to create a triable issue of fact

with respect to the contention that the *entire* shooting range constitutes a wetland. SAPS points to a 1989 letter from the Connecticut Conservation Commission Inland Wetlands and Watercourses Agency stating that the "entire site contains wetlands soils." J.A. at 456. But this says nothing about the presence of "plant species typically adapted to saturated soil conditions" and "wetland hydrology." *Rapanos*, 547 U.S. at 761 (Kennedy, J., concurring). The presence of "wetland soils" does not necessarily indicate the presence of a jurisdictional wetland. *See* 40 C.F.R. § 230.3(t). Next, SAPS points to the AEI report which, if anything, indicates that the firing range is *not* a wetland. AEI's "Site Description" indicates that SAPS "informed AEI that the grass-covered site slopes to the east towards extensive wetlands" and that "[w]etlands with standing water were observed north and east of the backstop/berm." J.A. at 633-34. In other words, the report suggests that the range is bordered by wetlands but is not itself a wetland. Finally, SAPS points to its Local Rule 56(a) Statement of Facts, and accompanying citations, for the proposition that "the entire Metacon site includes wetlands soils." *Id.* at 402. But again, the presence of wetlands soils is, standing alone, insufficient to establish a jurisdictional wetland. *See Rapanos*, 547 U.S. at 761 (Kennedy, J., concurring).

Moreover, the record provides evidence indicating that the shooting range is not a wetland. Metacon's Environmental Stewardship Plan, which SAPS relies on, Appellants' Br. 4, states that "wetlands *border the range* immediately to the North and extend East *beyond* the berm for approximately 100 yards." J.A. at 211 (emphasis added). It further provides that "[t]he range surface is mowed grass," which "makes recovery of lead particles difficult without destroying the grass cover." *Id.* at 211, 213. SAPS does not contest these claims, which are consistent with photos provided by Metacon's president. *Id.* at 581-86.

While we conclude as a matter of law that, on the record before us, neither the berm nor the

31

*entire* shooting range constitute jurisdictional wetlands, we proceed on the assumption that (1) the area bordering the shooting range to the north and east and (2) unspecified portions of the shooting range itself constitute such wetlands.[5] Because we also conclude that there is insufficient evidence of a point source discharge into these areas, however, *see infra* at § III.C.2, it is not necessary to determine whether SAPS has provided sufficient evidence to reach a jury on this issue.

**C. Discharge of Pollutants Into Navigable Waters From a Point Source**

**1. Point Source Versus Nonpoint Source Pollution**

Having concluded that there is insufficient evidence to raise a triable issue of fact as to whether the berm and *entire* shooting range lawn are jurisdictional wetlands, and assuming *arguendo* that (1) the area bordering the range to the north and east and (2) unspecified parts of the shooting range lawn constitute jurisdictional wetlands, and hence "navigable waters" for purposes of the CWA,

---

[5]SAPS provides at least some evidence that these areas constitute jurisdictional wetlands. With respect to unspecific portions of the shooting range, Metacon's 1990 Corps permit for the expansion of the berm provides as follows: "The firing range consists of the firing line, a mowed field (*a portion of which is wetland*) and a berm to stop bullets." J.A. at 471 (emphasis added). The Corps Regulatory Guidance Letter No. 05-02 states that "[w]ritten wetland delineations made prior to 14 August 1990 . . . with a specified time limit imposed by the Corps, will be valid until the date specified." Army Corps of Eng'rs Regulatory Guidance Letter No. 05-02 (June 14, 2005) ("Expiration of Geographic Jurisdictional Determinations of Waters of the United States"), *reprinted in* William Want, *Law of Wetlands Regulation* app. 8 (updated May 2009). Metacon's 1990 permit expired in 1995, meaning that the wetlands delineation underlying the permit was valid up until nine years before the present lawsuit was filed in 2004.

With respect to the northern and eastern borders of the range, Metacon's Environmental Stewardship Plan concedes that "[a] vernal pond is located directly in back of the backstop berm, and wetlands border the range immediately to the North and extend East beyond the berm for approximately 100 yards." J.A. at 211. Metacon's LGB report indicates that samples were "taken in the wetland area directly behind, or to the east of, the earthen berm," and these samples were of "surface water in the wetland." *Id.* at 266. Further, the president of Metacon refers to the 1990 Corps permit in a document attached to a 2006 affidavit, which states: "Metacon applied for an Army Corps Permit since *there is a federal wetland* located behind the berm, to the east of the shooting range." *Id.* at 587 (emphasis added).

the question is whether SAPS has provided sufficient evidence to create a material issue of fact as to whether Metacon is discharging lead munitions into these jurisdictional wetlands from a point source. *See* 33 U.S.C. § 1362(12) ("The term 'discharge of a pollutant' . . . means . . . any addition of any pollutant to navigable waters from any point source."). SAPS contends that there are two point sources on the Metacon site: the shooting range and the berm. Metacon responds that there is insufficient evidence that either the shooting range or the berm is a point source under the CWA.

Our construction of the CWA "begins with [the] statutory text and its plain meaning." *Bonime v. Avaya, Inc.*, 547 F.3d 497, 503 (2d. Cir. 2008). When considering the text, we must also "keep in mind context and the structure of the statute as a whole." *Nussle v. Willette*, 224 F.3d 95, 101 (2d Cir. 2000), *rev'd on other grounds*, *Porter v. Nussle*, 534 U.S. 516 (2002); *see also Bailey v. United States*, 516 U.S. 137, 145 (1995) ("[T]he meaning of statutory language, plain or not, depends on context." (internal quotation marks and citation omitted)); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (assessment of plain meaning must also look to "language and design of the statute as a whole").

The CWA defines "point source" as

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14). We have said that the "definition of a point source is to be broadly interpreted," and further:

> The touchstone of the regulatory scheme is that those needing to use the waters for waste distribution must seek and obtain a permit to discharge that waste, with the quantity and quality of the discharge regulated. The concept of a point source was

33

designed to further this scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter waters of the United States.

*Dague*, 935 F.2d at 1354-55 (quoting *United States v. Earth Scis., Inc.*, 599 F.2d 368, 373 (10th Cir.1979)); *see also Concerned Area Residents for the Env't v. Southview Farm*, 34 F.3d 114, 118 (2d Cir. 1994) ("[T]he definition of a point source is to be broadly interpreted.").

We have also made clear, however, that the phrase "discernible, confined, and discrete conveyance" cannot be interpreted so broadly as to read the point source requirement out of the statute. For example, we have held that whether a human being who discards vials of blood into the Hudson River constitutes a point source for purposes of § 1362(14) is at best ambiguous, so that a criminal conviction obtained on such a theory is inconsistent with the rule of lenity. *See United States v. Plaza Health Labs., Inc.*, 3 F.3d 643, 646 (2d Cir. 1993). In *Plaza Health Labs.*, we explained:

> [I]f every discharge involving humans were to be considered a "discharge from a point source[,]" the statute's lengthy definition of "point source" would have been unnecessary. It is elemental that congress does not add unnecessary words to statutes. Had congress intended to punish any human being who polluted navigational waters, it could readily have said: "any person who places pollutants in navigable waters without a permit is guilty of a crime."

*Id.* at 646; *see also id.* at 647 ("We find no suggestion either in the act itself or in the history of its passage that congress intended the CWA to impose criminal liability on an individual for the myriad, random acts of human waste disposal, for example, a passerby who flings a candy wrapper into the Hudson River, or a urinating swimmer. Discussions during the passage of the 1972 amendments indicate that congress had bigger fish to fry.").

The CWA's structure confirms this point. Although the term "nonpoint source" is not defined in the CWA, the statute clearly indicates that there is a category of nonpoint source pollution, and leaves the regulation of nonpoint source pollution to the states. *See* 33 U.S.C. § 1251(a)(7) ("[I]t is

34

the national policy that programs for the control of nonpoint sources of pollution be developed and implemented in an expeditious manner so as to enable the goals of this chapter to be met through the control of both point and nonpoint sources of pollution."); *id.* § 1329 (entitled "Nonpoint source management programs"); *see also* Frank P. Grad, *Treatise on Environmental Law* § 3.03 (updated 2009) ("The regulatory structure under the Clean Water Act emphasizes the distinction between 'point sources' and 'nonpoint sources.' Unlike point sources, nonpoint sources are not subject to the National Pollutant Discharge Elimination System (NPDES), under which the discharge of pollutants into the waters of the United States without permit is illegal. Control of nonpoint sources continues to be primarily a state function, with indirect federal participation."); *Plaza Health Labs.*, 3 F.3d at 647 (stating that authority over "control of pollutants from runoff . . . resides in the State or . . . local agency" (quoting S. Rep. No. 92-414, at 3744 (1971)); *id.* at 653 (Oakes, J., dissenting) ("The structure of the statute – which regulates point source pollution closely, while leaving nonpoint source regulation to the states under the Section 208 program – indicates that the term 'point source' was included in the definition of discharge so as to ensure that nonpoint source pollution would *not* be covered."); *Appalachian Power Co. v. Train*, 545 F.2d 1351, 1373 (4th Cir. 1976) ("Congress consciously distinguished between point source and nonpoint source discharges, giving EPA authority under the Act to regulate only the former.").

In *Natural Resources Defense Council, Inc. v. Muszynski*, 268 F.3d 91, 94 (2d Cir. 2001), this Court cited *Trustees for Alaska v. EPA*, 749 F.2d 549 (9th Cir. 1984), for its definition of a nonpoint source: "Congress had classified nonpoint source pollution as runoff caused primarily by rainfall around activities that employ or create pollutants. Such runoff could not be traced to any identifiable point of discharge." *Trustees for Alaska*, 749 F.2d at 558; *see also Plaza Health Labs.*, 3 F.3d at 652

(Oakes, J., dissenting) ("Nonpoint source pollution is, generally, runoff: salt from roads, agricultural chemicals from farmlands, oil from parking lots, and other substances washed by rain, in diffuse patterns, over the land and into navigable waters."); Frank P. Grad, *Treatise on Environmental Law* § 3.03 (updated 2009) ("Nonpoint sources include pollution from diffuse land use activities such as agriculture, construction and mining that enter the waters primarily through indiscrete and less identifiable natural processes such as runoffs, precipitation and percolation."). We also stated that "nonpoint sources . . . can consist of, for example, runoff due to the agricultural use of land adjoining a river." *Natural Res. Def. Council, Inc.*, 268 F.3d at 94; *see also* 33 U.S.C. § 1362(14) (stating that the term point source "does not include agricultural stormwater discharges.").

This is consistent with the EPA's guidance on nonpoint source pollution:

> [Nonpoint source pollution] is caused by diffuse sources that are not regulated as point sources and normally is associated with agricultural, silvicultural and urban runoff, runoff from construction activities, etc. Such pollution results in the human-made or human-induced alteration of the chemical, physical, biological, and radiological integrity of water. In practical terms, nonpoint source pollution does not result from a discharge at a specific, single location (such as a single pipe) but generally results from land runoff, precipitation, atmospheric deposition, or percolation.

EPA Office of Water, *Nonpoint Source Guidance* 3 (1987); *see also* Nonpoint Source Program and Grants Guidelines for States and Territories, 68 Fed. Reg. 60653, 60655 (2003) ("Nonpoint source pollution is caused by rainfall or snowmelt moving over and through the ground and carrying natural and human-made pollutants into lakes, rivers, streams, wetlands, estuaries, other coastal waters, and ground water."); EPA Office of Water, Polluted 5 (1994) (EPA Doc. No. 841-F-94-005) ("Nonpoint Source pollution is caused by rainfall or snowmelt moving over and through the ground. As the runoff moves, it picks up and carries away natural and human-made pollutants, finally depositing them into lakes, rivers, wetlands, coastal waters, and even our underground sources of drinking water.").

The EPA's NPDES regulations define the extent to which surface runoff can in certain circumstances constitute point source pollution. The definition of "Discharge of a pollutant" includes "additions of pollutants into waters of the United States from: surface runoff *which is collected or channelled by man*." 40 C.F.R. § 122.2 (emphasis added). By implication, surface water runoff which is neither collected nor channeled constitutes nonpoint source pollution and consequentially is not subject to the CWA permit requirement. *See Hardy v. N.Y. City Health & Hosps. Corp.*, 164 F.3d 789, 794 (2d Cir. 1999) (relying on "the familiar principle of *expressio unius est exclusio alterius*, the mention of one thing implies the exclusion of the other").

We accord the EPA's regulation *Chevron* deference. *See Estate of Landers v. Leavitt*, 545 F.3d 98, 106 (2d Cir. 2008) ("Most agency interpretations that have qualified for *Chevron* deference are rules that have been promulgated in regulations issued through notice and comment or adjudication, or in another format authorized by Congress for use in issuing 'legislative' rules." (internal quotation marks omitted)). At *Chevron* step one, we consider whether Congress has clearly spoken to the issue of *when* surface runoff can constitute a point source discharge. *See Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 116 (2d Cir. 2007). Given that nonpoint source pollution is not defined in the statute and a point source is merely defined as "any discernible, confined and discrete conveyance," we find that it has not. If we "cannot conclude that Congress has 'directly addressed the precise question at issue,' we will proceed to *Chevron* step two, which instructs us to defer to an agency's interpretation of the statute, so long as it is 'reasonable.'" *Cohen*, 498 F.3d at 116. Limiting the scope of the term point source to surface runoff that is collected or channeled by human beings is consistent with the CWA's definition of point sources as discernible, confined and discrete conveyances, such as "any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container,"

33 U.S.C. § 1362(14), and hence is reasonable.

Moreover, our case law is in accord with the EPA's regulations. We have indicated that "[t]o be sure, the [CWA] does generally contemplate that discharges be 'channelized' in order to fall within the EPA's regulatory jurisdiction; that is why the term 'point source' is defined as 'discrete, discernable, conveyances.'" *Waterkeeper Alliance, Inc.*, 399 F.3d at 510. Other Circuits have specifically held that "[b]road though [the] definition [of point source] may be, we are of [the] opinion that it does not include unchanneled and uncollected surface waters." *Appalachian Power Co.*, 545 F.2d at 1373; *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 842 n.8 (9th Cir. 2003) ("Diffuse runoff, such as rainwater that is not channeled through a point source, is considered nonpoint source pollution and is not subject to federal regulation."); *Shanty Town Assocs. LP v. EPA*, 843 F.2d 782, 785 n.2 (4th Cir. 1988) (stating that the definition of a point source "excludes unchanneled and uncollected surface runoff, which is referred to as 'nonpoint source' pollution"); *Sierra Club v. Abston Constr. Co., Inc.*, 620 F.2d 41, 47 (5th Cir. 1980) ("Although the point source definition excludes unchanneled and uncollected surface waters, surface runoff from rainfall, when collected or channeled by coal miners in connection with mining activities, constitutes point source pollution." (citations omitted) (internal quotation marks omitted)); *cf.* Robin Kundis Craig, *Local or National? The Increasing Federalization of Nonpoint Source Pollution Regulation*, 15 J. Envtl. L. & Litig. 179, 191 (2000) ("Although storm water runoff is generally a nonpoint source of water pollution, Congress recognized in 1987 that much storm water is actually collected and channeled before reaching waterways, such as in city drain systems. The 1987 [storm water permitting] amendments explicitly extended the federal NPDES permit program for point sources to cover municipal and industrial discharges of storm water.").

**2. SAPS's Evidence**

With the distinction between point source and nonpoint source pollution in mind, we turn to SAPS's evidence of point source discharges on Metacon's site. We conclude that SAPS has not provided sufficient evidence to raise a material issue of fact as to whether (1) the berm is a point source, and (2) assuming *arguendo* that the firing line of the shooting range is a point source, lead is discharged into jurisdictional wetlands from the firing line.

**a. The Berm**

SAPS first argues that the berm leaches lead into jurisdictional waters, and is therefore a point source which discharges pollutants into navigable waters. However, there is insufficient evidence in the record to support this claim. The LBG report, as noted previously, concludes that ground water beneath the shooting range "has not been impacted by lead from the . . . range" and, regarding wetland surface water, that "lead is not leaching out of the soil or surface water" to contaminate surrounding waters. J.A. at 266. The AEI report does not disagree. It indicates that tests were performed on certain soil samples taken from the berm and that these samples exceeded the CTDEP's Pollutant Mobility Criteria ("PMC") – its RSR for assessing, among other things, the capacity of pollutants potentially to leach. The report concludes based on this testing that "the lead is leachable and may over time pose a threat to ground water quality," *id.* at 643, but it does not provide evidence that any actual leaching has occurred.

For the reasons already articulated, the bare fact that soil samples from the Metacon berm may exceed Connecticut's RSR threshold for pollutant mobility is not enough, without more, to raise a material issue as to whether a serious risk of endangerment to ground water may be present, for the purpose of the RCRA. The AEI report suggests the lead is leachable but provides no information as

39

to the likelihood of leaching or the seriousness of any risk it presents. Notably, the CTDEP itself informed Connecticut's Attorney General on the basis of the LBG report, which analyzed ground and surface water, that "[a]ll the results indicated that lead was not detected or was present at concentrations in groundwater and surface water below action levels." *Id.* at 262.

For the purpose of a CWA permit violation, however, all that is necessary is an unauthorized discharge into jurisdictional waters. As we have already said, there is no evidence that lead has leached from the berm into ground water.[6] And SAPS has similarly provided no evidence that lead has migrated from the berm to Metacon wetlands through leaching. Lead was detected in wetland soils and surface waters near the berm. The AEI report suggests that if the lead migrated from the berm, however, it was by means *other than* leaching – that "wetland sediments and surface water behind and adjacent to the backstop/berm" may be "receptors" for lead contamination due to surface water runoff and airborne dust. J.A. at 637. This method of contamination, however, even assuming that it takes place, does not fall within the statute. *Id.* For even assuming the Metacon berm may be described as a "container," or "conduit," the record contains no evidence that it serves as a "confined and discrete conveyance" of lead to jurisdictional wetlands by these routes. *See* 33 U.S.C. § 1362(14).

The EPA's NPDES regulations, which SAPS does not challenge and to which we defer, make clear that surface water runoff that is neither collected nor channeled does not constitute point source pollution. *See* 40 C.F.R. § 122.2; *see also Natural Res. Def. Council, Inc.*, 268 F.3d at 94; *Trustees for Alaska*, 749 F.2d at 558; EPA Office of Water, *Nonpoint Source Guidance* 3 (1987). Even

---

[6]We thus need not address whether the CWA applies to ground water contamination, though there is authority that it does not. *See Rice v. Harken Exploration Co.*, 250 F.3d 264, 269 (5th Cir. 2001) ("The law in this Circuit is clear that ground waters are not protected waters under the CWA."); *Village of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 965 (7th Cir. 1994) ("[T]he Clean Water Act [does not] assert[ ] authority over ground waters.").

assuming rain and flooding at the Metacon site may cause lead in the berm to migrate to jurisdictional wetlands via surface water runoff, SAPS has provided no evidence that such runoff is in any way "collected or channeled by man." 40 C.F.R. § 122.2.[7] Thus, there is insufficient evidence that surface water runoff from the berm constitutes a discharge from a point source, and such runoff is outside the ambit of the CWA permit requirement.

This Court's precedent supports this conclusion. In *Concerned Area Residents for the Environment v. Southview Farm*, 34 F.3d 114 (2d Cir. 1994), we found that liquid manure that flowed from the field of a farm to a jurisdictional water constituted a discharge from two point sources: (1) a swale coupled with a pipe that channeled the manure and (2) manure-spreading vehicles that discharged manure onto the field. With respect to the swale, we noted that "the liquid manure was collected and channelized through the ditch or depression in the swale of field 104 and thence into the ditch leading to the stream." *Id.* at 119. SAPS points to no evidence of a similar conveyance in the case at bar. With respect to the manure spreading machines, this Court held as follows: "[W]e agree with the appellants that, alternatively, the manure spreading vehicles themselves were point sources. The collection of liquid manure into tankers and their discharge on fields from *which the manure directly flows into navigable waters* are point source discharges under the case law." *Id.* (emphasis added). Here, by contrast, there is no evidence that lead deposited into the berm directly

---

[7]This case is thus unlike *Sierra Club v. Abston Constr. Co., Inc.*, 620 F.2d 41 (5th Cir. 1980), in which the Fifth Circuit found a material issue of fact with respect to whether surface runoff was collected or channeled in connection with coal mining activities. The Fifth Circuit pointed to an affidavit in the record noting both "gullies and ditches running down the sides of steep spoil piles created by Abston Construction Company" and that "sedimentation and pollutants are carried through these discernible, confined and discrete conveyances to Daniel Creek." *Id.* at 46. No such evidence is present here.

flows into Metacon wetlands. The AEI report indicates that it does so only as part of surface water runoff, which results from rain or flooding. Moreover, unlike in *Concerned Area Residents*, there is no evidence that the surface water runoff from the berm containing lead is in anyway channeled or collected.

We also find that lead in the berm that migrates to jurisdictional wetlands as airborne dust does not constitute a discharge from a point source. Based on the record before us, there is no evidence that airborne lead moves by any "discernible, confined and discrete conveyance," 33 U.S.C. § 1362(14), to Metacon wetlands. The berm simply cannot be described as a "discernible, confined and discrete conveyance" with respect to lead that is carried by the wind, some portion of which may happen to land on nearby wetlands. *See Waterkeeper Alliance, Inc.*, 399 F.3d at 510 ("[T]he [CWA] does generally contemplate that discharges be 'channelized' in order to fall within the EPA's regulatory jurisdiction.").

To be clear, our holding is not that a berm can never constitute a point source, but only that there is insufficient evidence that the migration of lead from Metacon's berm by virtue of runoff and airborne dust is a point source discharge. *Cf. Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d 778, 784 n.4 ("[W]hile a dam might not always be considered a point source, the dam turbines that were the focus of the decision in *S.D. Warren* clearly were a point source."). Even assuming the berm is an identifiable source from which lead pollution reaches jurisdictional wetlands – a generous assumption on the record here – this is not enough to satisfy the CWA requirement of a point source discharge. Otherwise, "a passerby who flings a candy wrapper into the Hudson River, or a urinating swimmer" would constitute point sources. *Plaza Health Labs.*, 3 F.3d at 647. So too would "runoff due to the agricultural use of land adjoining a river," *Nat. Res. Defense Council, Inc.*, 268 F.3d at 94,

42

or runoff of "salt from roads," "oil from parking lots," *Plaza Health Labs.*, 3 F.3d at 652 (Oakes, J., dissenting), or pollutants "from construction activities." EPA Office of Water, *Nonpoint Source Guidance* 3 (1987). But these are paradigmatic examples of nonpoint source pollution.

Both the CWA's definition of a point source and the CWA's structure, which leaves the regulation of nonpoint source pollution to the states, make clear that Congress chose to exempt a class of pollution from the CWA's permit requirement. To find that SAPS has presented sufficient evidence that the berm constitutes a point source on the undeveloped record before us would imply that runoff or windblown pollutants from any identifiable source, whether channeled or not, are subject to the CWA permit requirement. Such a construction would eviscerate the point source requirement and undo Congress's choice. The CWA's broad remedial purpose, *i.e.*, to "restore and maintain the chemical, physical and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), cannot override the plain text and structure of the statute. *See Plaza Health Labs.*, 3 F.3d at 647.

In sum, a point source discharge requires that pollutants reach navigable waters by a "discernible, confined and discrete conveyance" and the AEI report's vague references to potential surface water runoff and windblown dust from the berm are insufficient to raise a material issue of fact that these are point source discharges.

**b. The Firing Line**

SAPS also argues that the firing line from which Metacon members shoot constitutes a point source. We need not reach the issue, however. Assuming *arguendo* that the firing line of the shooting range constitutes a point source, SAPS has failed to adduce sufficient evidence that lead shot is discharged from the firing line into jurisdictional wetlands. SAPS does not contend that bullets from the firing line are discharged into the wetlands located on the northern and eastern borders of the

43

range – the area that Metacon itself admits to be wetlands. Appellants' Br. 19-20; Appellants' Reply Br. 14-16. In any event, there is insufficient evidence in the record that this occurs. While bullets are discharged into the berm, as explained above, the berm does not constitute a jurisdictional wetland.

This leaves the possibility that bullets are discharged from the firing line into unspecified jurisdictional wetlands on the shooting range itself. Metacon indicates that, in addition to the berm, lead bullets are also discharged into "[t]arget lines . . . downrange at 10, 25, 50, 75 and 100 yards." J.A. at 211. SAPS has introduced evidence that certain samples drawn from locations between the firing line and the berm had intermediate concentrations of lead as compared to samples drawn from the berm, where the lead concentrations were highest, and the firing line, which had the lowest levels of concentration. *Id*. at 642. Not surprisingly, the highest concentrations of lead in locations between the firing line and the berm were detected adjacent to the target holders. *Id.*

Although this evidence suggests lead is discharged into the shooting range lawn from the firing line, with higher concentrations of lead accumulating near the targets, SAPS has provided no evidence that the targets are positioned on or near jurisdictional wetlands. Moreover, SAPS has provided no evidence that soil samples drawn from the shooting range lawn, and indicating elevated levels of lead, were drawn from or near jurisdictional wetlands. Even assuming the presence of jurisdictional wetlands *somewhere* on the shooting range, there is no evidence that lead is discharged into those areas, and hence there is an insufficient basis for a reasonable jury to draw an inference that lead is discharged from the firing line into jurisdictional wetlands on the range.

To summarize, SAPS has failed to provide sufficient evidence to raise a triable issue of fact as to whether (1) any lead that may reach jurisdictional wetlands from the berm results from a "point source" discharge; and (2) lead that is discharged from the firing line constitutes a discharge into

44

jurisdictional wetlands. Accordingly, SAPS has not marshaled sufficient evidence to warrant a jury trial on an essential element of its CWA claim, i.e., that Metacon discharges lead munitions into "navigable waters from any point source." 33 U.S.C. § 1362(12). The district court's grant of summary judgment to Metacon on that claim is affirmed.

**IV. Conclusion**

For the above reasons, the judgment of the district court in favor of Metacon is AFFIRMED.