FLOYD, Circuit Judge, dissenting:
 

 Based on allegations that pollutants are being added into navigable waters, the majority concludes that the Appellants have adequately alleged a cognizable and ongoing Clean Water Act ("CWA") violation. Maj. Op. at 649. While this conclusion may seem intuitive at first glance, close examination of the text, history, and structure of the CWA reveals that not every addition of pollution amounts to a CWA violation-much less an ongoing CWA violation. Congress precisely defined a CWA violation as the addition of pollutants
 
 from a point source
 
 , and for there to be an ongoing CWA violation, there must be an ongoing addition of pollutants from a point source into navigable waters.
 
 See
 

 33 U.S.C. § 1362
 
 (12). Here, the only point source at issue-Kinder Morgan's pipeline-has been repaired and is not currently adding any pollutants into navigable waters, thus negating a necessary element of a CWA violation. Because there is no ongoing violation under the meaning of the CWA, I would affirm the district court's dismissal of the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. I respectfully dissent.
 

 I.
 

 A.
 

 The parties' pleadings and briefs reveal the following facts. In late 2014, residents of Belton, South Carolina, discovered that Kinder Morgan's pipeline released a large amount of gasoline and contaminated the nearby ground ("spill site"). Kinder Morgan repaired the pipeline within a few days of discovering the leak and began remediation efforts that are ongoing to this day under the supervision of the South Carolina Department of Health and Environmental Control (DHEC). Kinder Morgan has recovered over 209,000 gallons of gasoline, but over 160,000 gallons of gasoline remain unrecovered at the spill site. Kinder Morgan's repaired pipeline is not currently leaking any additional gasoline. Nevertheless, as the gasoline from the spill site gets washed off by ground water or seeps through the ground from the spill site, gasoline is being introduced to navigable waters. In December 2016, the environmental groups Upstate Forever and Savannah Riverkeeper (collectively, "Appellants") initiated a citizen suit against Kinder Morgan, alleging an ongoing CWA violation. After full briefing on the matter, on April 20, 2017, the district court dismissed the Appellants' complaint for lack of subject matter jurisdiction and failure to state a claim.
 

 B.
 

 We review a district court's order dismissing a complaint for lack of subject matter jurisdiction and for failure to state a claim
 
 de novo
 
 .
 

 Goldfarb v. Mayor & City Council of Balt.
 
 ,
 
 791 F.3d 500
 
 , 505 (4th Cir. 2015). Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to move to dismiss a plaintiff's complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). To determine whether subject matter jurisdiction exists, courts are "to regard the pleadings' allegations as mere evidence ... and may consider evidence outside of the pleadings without converting the proceeding to one for summary judgment."
 
 Richmond, Fredericksburg & Potomac R. Co. v. United States
 
 ,
 
 945 F.2d 765
 
 , 768 (4th Cir. 1991). The nonmoving plaintiff bears the burden of proving subject matter jurisdiction, and "the moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."
 

 Id.
 

 Rule 12(b)(6) allows a party to move to dismiss the plaintiff's complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6). When a complaint is attacked by a Rule 12(b)(6) motion, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions...."
 
 Bell Atl. Corp. v. Twombly
 
 ,
 
 550 U.S. 544
 
 , 555,
 
 127 S.Ct. 1955
 
 ,
 
 167 L.Ed.2d 929
 
 (2007) (internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level."
 

 Id.
 

 II.
 

 Congress enacted the CWA,
 
 33 U.S.C. § 1251
 

 et seq.
 
 ,"to restore and maintain the chemical, physical, and biological integrity of the Nation's waters,"
 
 33 U.S.C. § 1251
 
 . To accomplish these goals, Congress comprehensively reshaped the federal water regulatory scheme in various ways.
 
 See
 

 EPA v. California ex rel. State Water Res. Control Bd.
 
 ,
 
 426 U.S. 200
 
 , 203-4,
 
 96 S.Ct. 2022
 
 ,
 
 48 L.Ed.2d 578
 
 (1976).
 

 First, Congress concentrated the federal regulatory effort on curtailing point source pollution-that is, pollution from "discernible, confined and discrete conveyance[s],"
 
 33 U.S.C. § 1362
 
 (14) -"which tended to be more notorious and more easily targeted,"
 
 Or. Nat. Desert Ass'n v. U.S. Forest Serv.
 
 ,
 
 550 F.3d 778
 
 , 780 (9th Cir. 2008). Second, Congress established the National Pollution Discharge Elimination System (NPDES) which "requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters."
 
 S. Fla.Water Mgmt. Dist. v. Miccosukee Tribe of Indians
 
 ,
 
 541 U.S. 95
 
 , 102,
 
 124 S.Ct. 1537
 
 ,
 
 158 L.Ed.2d 264
 
 (2004). Third, Congress sought to ensure compliance by instituting an enforcement mechanism under which state and federal governments bear the primary responsibility for policing past and ongoing CWA violations, and private citizens provide supplementary enforcement for ongoing violations.
 
 Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.
 
 ,
 
 484 U.S. 49
 
 , 52-53, 58,
 
 108 S.Ct. 376
 
 ,
 
 98 L.Ed.2d 306
 
 (1987) ;
 
 The Piney Run Preservation Ass'n v. The Cty. Comm'rs of Carroll Cty., Md.
 
 ,
 
 523 F.3d 453
 
 , 456 (4th Cir. 2008).
 

 While the CWA includes other important features, it bears explaining these three central features in detail, as they are critical to this appeal.
 

 A.
 

 In drafting the CWA, Congress focused the federal regulatory effort on reducing point source pollution by making the existence of, and the addition of pollutants from, a point source a
 
 sine qua non
 
 element of a CWA violation. The text and structure of the CWA unambiguously lead to this conclusion.
 

 At the outset, it is important to note that "Congress consciously distinguished between
 point source and nonpoint source discharges."
 
 Appalachian Power Co. v. Train
 
 ,
 
 545 F.2d 1351
 
 , 1373 (4th Cir. 1976). Point source pollution is pollution from "any discernible, confined and discrete conveyance."
 
 33 U.S.C. § 1362
 
 (14). The non-exhaustive list of examples of a point source in the CWA includes "pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft."
 

 Id.
 

 All other sources of pollution-namely, those that are not "discernible, confined and discrete,"
 

 id.
 

 -are considered nonpoint sources.
 
 Or. Nat. Desert Ass'n
 
 ,
 
 550 F.3d at 780
 
 . In other words, nonpoint source pollution "is defined by exclusion and includes all water quality problems" that are not from a point source.
 
 Nat'l Wildlife Fed'n v. Gorsuch
 
 ,
 
 693 F.2d 156
 
 , 166 (D.C. Cir. 1982).
 

 Unlike point source pollution, nonpoint source pollution "arises from many dispersed activities over large areas, and is not traceable to any single discrete source."
 
 League of Wilderness Defs./Blue Mts. Biodiversity Project v. Forsgren
 
 ,
 
 309 F.3d 1181
 
 , 1183 (9th Cir. 2002). "Congress had classified nonpoint source pollution as runoff caused primarily by rainfall around activities that employ or create pollutants."
 
 Cordiano v. Metacon Gun Club, Inc.
 
 ,
 
 575 F.3d 199
 
 , 220 (2d Cir. 2009) (internal quotation marks omitted). Indeed, a common example of nonpoint source pollution is rain washing pollution off the highway and carrying it along "by runoff in a polluted soup[ ] [to] creeks, rivers, bays, and the ocean."
 
 Forsgren
 
 ,
 
 309 F.3d at 1183
 
 . The EPA guidance on nonpoint source pollution similarly confirms that "[i]n practical terms, nonpoint source pollution does not result from a discharge at a specific, single location (such as a single pipe) but generally results from land runoff, precipitation, atmospheric deposition, or percolation."
 
 Cordiano
 
 ,
 
 575 F.3d at 220
 
 (quoting EPA Office of Water,
 
 Nonpoint Source Guidance
 
 3 (1987)).
 

 That Congress intended to target point source pollution, rather than nonpoint source pollution, is evident from the text of the CWA, which makes the existence of a point source a required element of a CWA violation.
 
 33 U.S.C. § 1311
 
 (a) provides that "[e]xcept as in compliance with [the various section in the CWA], the discharge of any pollutant by any person shall be unlawful." "Discharge of a pollutant" is a term of art under the CWA, with a more precise meaning than under ordinary parlance.
 
 Cf.
 

 Burgess v. United States
 
 ,
 
 553 U.S. 124
 
 , 129,
 
 128 S.Ct. 1572
 
 ,
 
 170 L.Ed.2d 478
 
 (2008) ("Statutory definitions control the meaning of statutory words ... in the usual case." (internal quotation marks omitted)). Congress defined "discharge of a pollutant" as "any addition of any pollutant to navigable waters
 
 from any point source
 
 ."
 
 33 U.S.C. § 1362
 
 (12) (emphasis added).
 

 In summarizing the requirements under these two statutory provisions,
 
 33 U.S.C. §§ 1311
 
 (a), 1362(12), courts have consistently restated the elements of a CWA violation as "(1) discharg[ing] (2) a pollutant (3) into navigable waters (4)
 
 from a point source
 
 (5) without a [NPDES] permit."
 
 Sierra Club v. El Paso Gold Mines, Inc.
 
 ,
 
 421 F.3d 1133
 
 , 1142 (10th Cir. 2005) (emphasis added);
 
 see also
 

 Parker v. Scrap Metal Processors, Inc.
 
 ,
 
 386 F.3d 993
 
 , 1008 (11th Cir. 2004) ;
 
 Comm. To Save Mokelumne River v. E. Bay Mun. Util. Dist.
 
 ,
 
 13 F.3d 305
 
 , 309 (9th Cir. 1993) ;
 
 Nat'l Wildlife Fed'n v. Consumers Power Co.
 
 ,
 
 862 F.2d 580
 
 , 583 (6th Cir. 1988) ("[F]or NPDES requirements to apply to any given set of circumstances, 'five elements must be present: (1) a
 
 pollutant
 
 must be (2)
 
 added
 
 (3)
 
 to navigable waters
 
 (4)
 
 from
 
 (5) a
 
 point source
 
 .' " (quoting
 
 Gorsuch
 
 ,
 
 693 F.2d at
 
 165 ) );
 

 Avoyelles Sportsmen's League, Inc. v. Marsh
 
 ,
 
 715 F.2d 897
 
 , 922 (5th Cir. 1983). The "point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters[.] ...' "
 
 Miccosukee Tribe
 
 ,
 
 541 U.S. at 105
 
 ,
 
 124 S.Ct. 1537
 
 . For there to be a conveyance or "addition" of pollutants under the meaning of the CWA, "a 'point source must
 
 introduce
 
 the pollutant into navigable water from the outside world[,]' ... [that is,] any place outside the particular body of water to which pollutants are introduced."
 
 Catskill Mts. Chapter of Trout Unlimited, Inc. v. City of New York
 
 ,
 
 273 F.3d 481
 
 , 491 (2d Cir. 2001) (quoting
 
 Gorsuch
 
 ,
 
 693 F.2d at
 
 165 ). As these definitions unambiguously show, a critical element of a CWA violation is that the pollutant comes from a point source.
 

 Furthermore, the general structure of the CWA confirms that Congress sought to focus on point source pollution. "A central provision of the [CWA] is its requirement that individuals, corporations, and governments secure [NPDES] permits before discharging pollution from any point source into the navigable waters ..."
 
 Decker v. Nw. Envtl. Def. Ctr.
 
 ,
 
 568 U.S. 597
 
 , 602,
 
 133 S.Ct. 1326
 
 ,
 
 185 L.Ed.2d 447
 
 (2013). Under the CWA, point source pollution is regulated by the EPA through the NPDES permitting program,
 
 see
 

 33 U.S.C. § 1342
 
 , and nonpoint source pollution is regulated by the states,
 
 see
 

 33 U.S.C. § 1329
 
 ;
 
 Cordiano
 
 ,
 
 575 F.3d at
 
 219-220 ;
 
 Gorsuch
 
 ,
 
 693 F.2d at 165-66
 
 . Based on this structure, courts have consistently recognized that "nonpoint sources of pollution have not generally been targeted by the CWA...."
 
 Or. Nat. Desert Ass'n
 
 ,
 
 550 F.3d at 785
 
 . In drafting the CWA, "[w]hile Congress could have defined a 'discharge' to include generalized runoff, ... it chose to limit the permit program's application to the ... [point source] category."
 

 Id.
 

 (quoting William L. Andreen,
 
 Water Quality Today-Has the Clean Water Act Been A Success?
 
 ,
 
 55 Ala. L. Rev. 537
 
 , 562 (2004) ). In sum, the fact that "the [CWA] assigns the primary responsibility for regulating point sources to the EPA and nonpoint sources to the states,"
 
 Am. Farm Bureau Fed'n v. EPA
 
 ,
 
 792 F.3d 281
 
 , 299 (3d Cir. 2015), plainly shows that Congress's main focus in enacting the CWA was the reduction of point source pollution.
 

 A careful review of the CWA's text and structure reveals that Congress sought to target point source pollution and thus included point source as an indispensable element of a CWA violation.
 
 [1]
 

 B.
 

 Congress chose the NPDES permitting program as a central means of controlling point source pollution. "[I]ndividuals, corporations, and governments [must] secure [NPDES] permit[s] before discharging pollution from any point source into the navigable waters of the United States."
 
 Decker
 
 , 568 U.S. at 602,
 
 133 S.Ct. 1326
 
 .
 

 Under the CWA, the state and federal governments act as partners in administering the NPDES program and issuing the permits.
 
 Arkansas v. Oklahoma
 
 ,
 
 503 U.S. 91
 
 , 101,
 
 112 S.Ct. 1046
 
 ,
 
 117 L.Ed.2d 239
 
 (1992). An NPDES permit can be issued by either the EPA or a state agency. The EPA "initially administers the NPDES permitting system for each State, but a State may apply for a transfer of permitting authority to state officials."
 
 Nat'l Ass'n of Home Builders v. Defs. of Wildlife
 
 ,
 
 551 U.S. 644
 
 , 650,
 
 127 S.Ct. 2518
 
 ,
 
 168 L.Ed.2d 467
 
 (2007). "If authority is transferred, then state officials-not the federal EPA-have the primary responsibility for reviewing and approving NPDES discharge permits, albeit with continuing EPA oversight."
 

 Id.
 

 An NPDES permit "place[s] limits on the type and quantity of pollutants that can be released into the Nation's waters,"
 
 Miccosukee Tribe
 
 ,
 
 541 U.S. at 102
 
 ,
 
 124 S.Ct. 1537
 
 , and "defines, and facilitates compliance with, and enforcement of, ... a discharger's obligations under the [CWA],"
 
 California ex rel. State Water Res. Control Bd.
 
 ,
 
 426 U.S. at 205
 
 ,
 
 96 S.Ct. 2022
 
 . The EPA promulgates the "effluent limitations" that "restrict the quantities, rates, and concentrations of specified substances which are discharged."
 
 Arkansas
 
 ,
 
 503 U.S. at 101
 
 ,
 
 112 S.Ct. 1046
 
 ;
 
 see also
 

 33 U.S.C. §§ 1311
 
 , 1314. The states, with substantial guidance from EPA, promulgate the "water quality standards" that express the states' "desired condition of a waterway ... so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels."
 
 Id
 
 . (internal quotation marks);
 
 see also
 

 33 U.S.C. § 1313
 
 . In addition to listing the effluent limitations and water quality standards, NPDES permits also require "compliance with the inspection, reporting and monitoring requirements of the [CWA] as outlined in
 
 33 U.S.C. § 1318
 
 ."
 
 Menzel v. Cty. Util. Corp.
 
 ,
 
 712 F.2d 91
 
 , 94 (4th Cir. 1983). To the benefit of NPDES permit holders, the CWA "shields NPDES permit holders from liability if their discharges comply with their permits."
 
 Ohio Valley Envtl.Coal. v. Fola Coal Co., LLC
 
 ,
 
 845 F.3d 133
 
 , 135 (4th Cir. 2017). The NPDES permitting scheme thus constitutes "[t]he primary means for enforcing these limitations and standards."
 
 Arkansas
 
 ,
 
 503 U.S. at 101
 
 ,
 
 112 S.Ct. 1046
 
 .
 

 NPDES permitting is, however, not only ill-equipped to address, but also inapplicable to, nonpoint source pollution. Unlike a point source, nonpoint source pollution "arises from many dispersed activities over large areas, and is not traceable to any single discrete source."
 
 Forsgren
 
 ,
 
 309 F.3d at 1184
 
 . And for that reason, nonpoint source pollution "is very difficult to regulate through individual permits."
 

 Id.
 

 More specifically, it would be difficult to mandate compliance with inspection, reporting, and monitoring requirements given that nonpoint source pollution cannot be traced to discrete sources. Thus, sensibly, the CWA does not attempt to regulate nonpoint source pollution through the NPDES permitting.
 
 See
 

 El Paso
 
 ,
 
 421 F.3d at
 
 1140 n.4 (observing that "[g]roundwater seepage that travels through fractured rock would be nonpoint source pollution, which is not subject to NPDES permitting");
 
 Forsgren
 
 ,
 
 309 F.3d at 1183
 
 (stating that
 nonpoint source pollution "is regulated in a different way and does not require [an NPDES] permit);
 
 Gorsuch
 
 ,
 
 693 F.2d at 166
 
 (accepting the EPA's explanation of the CWA that nonpoint source pollution "includes all water quality problems not subject to § 402 [NPDES permit program]").
 

 In sum, Congress chose the NPDES permitting scheme as the primary means of controlling point source pollution, which is the focus of the CWA regulatory scheme.
 

 C.
 

 Congress also instituted a comprehensive enforcement scheme to ensure compliance with the CWA, in which the state and federal governments bear the primary responsibility for enforcement, but private citizens have limited supplementary enforcement authority.
 

 Under the CWA, "the primary responsibility for enforcement rests with the state and federal governments...."
 
 The Piney Run
 
 ,
 
 523 F.3d at 456
 
 (quoting
 
 Sierra Club v. Hamilton Cty. Bd. of Cty. Comm'rs
 
 ,
 
 504 F.3d 634
 
 , 637 (6th Cir. 2007) ).
 
 33 U.S.C. § 1319
 
 vests the EPA with a broad range of enforcement tools-criminal, civil, and administrative.
 
 See, e.g.
 
 ,
 
 Sackett v. EPA
 
 ,
 
 566 U.S. 120
 
 , 122,
 
 132 S.Ct. 1367
 
 ,
 
 182 L.Ed.2d 367
 
 (2012) ("If the EPA determines that any person is in violation of [the CWA], the Act directs the agency either to issue a compliance order or to initiate a civil enforcement action.");
 
 United States v. Schallom
 
 ,
 
 998 F.2d 196
 
 , 198 (4th Cir. 1993) (per curiam) (affirming a criminal conviction for discharging pollutants without a permit in violation of
 
 33 U.S.C. § 1319
 
 (c)(2) ). The EPA may initiate administrative and civil proceedings for both present and past CWA violations.
 
 See
 

 Gwaltney
 
 ,
 
 484 U.S. at 58
 
 ,
 
 108 S.Ct. 376
 
 .
 

 The CWA also includes a citizen suit provision,
 
 33 U.S.C. § 1365
 
 (a), under which "private citizens provide a second level of enforcement and can serve as a check to ensure the state and federal governments are diligent in prosecuting [CWA] violations."
 
 The Piney Run
 
 ,
 
 523 F.3d at 456
 
 (quoting
 
 Hamilton Cty. Bd. of Cty. Comm'rs
 
 ,
 
 504 F.3d at
 
 637 ). Under the citizen suit provision, "any citizen may commence a civil action ... against any person ... who is alleged to be in violation of" the CWA.
 
 33 U.S.C. § 1365
 
 (a)(1). However, "the citizen suit is meant to supplement rather than to supplant governmental action,"
 
 Gwaltney
 
 ,
 
 484 U.S. at 60
 
 ,
 
 108 S.Ct. 376
 
 , and, therefore, Congress limited a citizen's ability to enforce the CWA in various ways.
 
 [2]
 

 One important jurisdictional limit on a citizen's ability to enforce the CWA is that she may only bring a suit for an
 
 ongoing
 
 CWA violation but not for a
 
 past
 
 violation.
 

 Id.
 

 at 57
 
 ,
 
 108 S.Ct. 376
 
 . The text of the
 CWA authorizes a citizen suit only against someone "alleged to be in violation of" the CWA.
 
 33 U.S.C. § 1365
 
 (a)(1). The Supreme Court concluded that "[t]he most natural reading of 'to be in violation' is a requirement that citizen-plaintiffs allege a state of either
 
 continuous
 
 or
 
 intermittent
 
 violation-that is, a reasonable likelihood that a past polluter will continue to pollute in the future."
 
 Gwaltney
 
 ,
 
 484 U.S. at 57
 
 ,
 
 108 S.Ct. 376
 
 (emphasis added). The
 
 Gwaltney
 
 Court further stated that "Congress could have phrased its requirement in language that looked to the past ('to have violated'), but it did not choose this readily available option."
 

 Id.
 

 In other words, Congress did not authorize a citizen to enforce the CWA for "wholly past violations."
 

 Id.
 

 The Supreme Court observed that allowing citizens to pursue wholly past violations "could undermine the supplementary role envisioned for the citizen suit."
 

 Id.
 

 at 60
 
 ,
 
 108 S.Ct. 376
 
 . Thus, a citizen seeking to commence a citizen suit "must show that the defendant's violations of the CWA are ongoing at the time of suit."
 
 Am. Canoe Ass'n v. Murphy Farms, Inc.
 
 ,
 
 326 F.3d 505
 
 , 521 (4th Cir. 2003).
 

 Therefore, although Congress envisioned private citizens playing an important role in the CWA enforcement by providing supplementary enforcement, it also placed jurisdictional limitations on citizen suits by requiring the existence of an ongoing violation.
 

 III.
 

 The threshold jurisdictional question in this appeal is whether there is a cognizable and ongoing CWA violation such that the Appellants' citizen suit may proceed.
 
 See
 

 Gwaltney
 
 ,
 
 484 U.S. at 57
 
 ,
 
 108 S.Ct. 376
 
 . In my view, the Appellants have failed to show that the CWA violation is ongoing, because there is no ongoing discharge of pollutants from a point source.
 
 Cf.
 

 Am. Canoe Ass'n
 
 ,
 
 326 F.3d at 521
 
 . Instead, the facts presented to us in the record demonstrate that there is an ongoing groundwater migration from the spill site, which does not amount to a CWA violation and cannot support a citizen suit.
 
 See
 

 Or. Nat. Desert Ass'n
 
 ,
 
 550 F.3d at 785
 
 (noting that Congress chose not to include generalized runoff within the definition of "discharge").
 

 A.
 

 In my view, there is no ongoing CWA violation. The Appellants cannot show that there is an ongoing discharge of pollutants from a point source, because the only point source at issue-the pipeline-is not currently leaking or releasing any pollutants.
 

 A CWA violation is defined as an unpermitted "discharge of any pollutant by any person."
 
 33 U.S.C. § 1311
 
 (a). "Discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source."
 
 33 U.S.C. § 1362
 
 (12). For there to be an "addition ... from a point source,"
 

 id.
 

 , the point source must convey, transport, or introduce the pollutant to navigable waters.
 
 See
 

 Miccosukee Tribe
 
 ,
 
 541 U.S. at 105
 
 ,
 
 124 S.Ct. 1537
 
 (observing that "a point source ... need only convey the pollutant to 'navigable waters' " and that the examples of point sources in
 
 33 U.S.C. § 1362
 
 (12) are objects that "transport" pollutants);
 
 Catskill Mts.
 
 ,
 
 273 F.3d at 491
 
 ("[A] 'point source must
 
 introduce
 
 the pollutant into navigable water from the outside world.' " (quoting
 
 Gorsuch
 
 ,
 
 693 F.2d at
 
 165 )). In other words, to constitute a CWA violation, a point source must have been involved in the discharging activity.
 

 Thus, for there to be an
 
 ongoing
 
 CWA violation, a point source must currently be involved in the discharging activity by adding, conveying, transporting, or introducing pollutants to navigable waters.
 
 See
 

 El Paso Gold Mines
 
 ,
 
 421 F.3d at 1140
 
 (summarizing
 the "ongoing migration cases" in which there was "an identifiable discharge from a point source that
 
 occurred in the past
 
 ...," but "[a]t the time of suit, the discharging activity
 
 from a point source
 
 ... had ceased," and citizen suits were dismissed). The majority notes that "[t]he CWA's language does not require that the point source continue to release a pollutant for a violation to be ongoing." Maj. Op. at 648. It is difficult to see how there could be an ongoing CWA violation-defined as "any addition of pollutants ... from any point source"-without an ongoing discharging activity from a point source. In my view, to constitute an ongoing CWA violation (i.e. ongoing point source pollution), the point source's discharging, adding, conveying, transporting, or introducing of pollutants must be continuous.
 

 Kinder Morgan's pipeline is not presently leaking or releasing gasoline; therefore, the only relevant point source is not currently discharging-adding, conveying, transporting, or introducing-pollutants to navigable waters.
 
 Cf.
 

 Miccosukee Tribe
 
 ,
 
 541 U.S. at 105
 
 ,
 
 124 S.Ct. 1537
 
 ;
 
 Catskill Mts.
 
 ,
 
 273 F.3d at 491
 
 . Thus, in my view, there is no ongoing violation under the meaning of the CWA. This should therefore end the Appellants' citizen suit, which requires an ongoing CWA violation.
 
 See
 

 33 U.S.C. §§ 1362
 
 (12) ; 1365(a);
 
 Gwaltney
 
 ,
 
 484 U.S. at 57
 
 ,
 
 108 S.Ct. 376
 
 . The majority also seemingly recognizes that pollutants must be actively "
 
 originating
 
 from a point source." Maj. Op. at 648 (emphasis added). However, the majority's theory is that since the pollutants in the spill site
 
 once came
 
 from the pipeline, the continuing addition from the spill site is thus a continuing discharge from a point source. But accepting this position would effectively erase the phrase
 
 from any point source
 
 out of the CWA,
 
 33 U.S.C. § 1362
 
 (12), and find an ongoing CWA violation even though no pollutant is originating or being added from a point source any longer. Thus, in my view, the majority disregards point source as an element of a CWA violation and invents a violation not cognizable under the CWA.
 

 Because the pipeline is not actively and continuously discharging pollutants, there is no ongoing violation, but only a wholly past violation, under the meaning of the CWA.
 

 B.
 

 In my view, this is an ongoing migration case, which does not amount to an ongoing CWA violation and cannot support a citizen suit. Kinder Morgan is a past violator-that is, it indirectly added pollutants to navigable waters from its point source when its pipeline leaked and released a large amount of gasoline that reached navigable waters. Although Kinder Morgan's pipeline itself is not currently leaking, the effects of Kinder Morgan's past violation continue. The spill site continues to introduce gasoline into navigable waters as gasoline migrates through the ground or as ground water washes off and carries gasoline to navigable waters. This Court has not addressed whether a past discharge with lasting effects-through an ongoing migration of pollutants through groundwater movement-can support a citizen suit.
 
 See
 

 Ohio Valley Envtl. Coal., Inc. v. Hernshaw Partners, LLC
 
 ,
 
 984 F.Supp.2d 589
 
 , 597 (S.D. W. Va. 2013) (observing there is no Fourth Circuit precedent directly on point).
 

 Given similar circumstances, however, several federal courts have concluded that ongoing migration of pollutants from a past discharge does not amount to an ongoing discharge necessary to support a citizen suit under the CWA.
 
 Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.
 
 ,
 
 989 F.2d 1305
 
 , 1312-13 (2d Cir. 1993)
 

 (finding no ongoing CWA violation because the alleged polluter had "ceased operation of the Gun Club" that deposited lead shot and clay target debris into navigable waters "by the time plaintiff filed suit");
 
 Pawtuxet Cove Marina v. Ciba-Geigy Corp.
 
 ,
 
 807 F.2d 1089
 
 , 1094 (1st Cir. 1986) (finding no ongoing CWA violation because "[a]t the time plaintiffs brought suit, ... defendant had ceased operating");
 
 Hamker v. Diamond Shamrock Chem. Co.
 
 ,
 
 756 F.2d 392
 
 , 397 (5th Cir. 1985) (finding no ongoing CWA violation because "the complaint alleges ... only that there are continuing
 
 effects
 
 from the past discharge, and such an allegation is insufficient for the purposes of section 1365.");
 
 Aiello v. Town of Brookhaven
 
 ,
 
 136 F.Supp.2d 81
 
 , 120-21 (E.D.N.Y. 2001) (concluding that the ongoing migration of residual leachate plume from a past violation is not an ongoing CWA violation),
 
 Wilson v. Amoco Corp.
 
 ,
 
 33 F.Supp.2d 969
 
 , 975-76 (D. Wyo. 1998) ;
 
 Friends of Santa Fe Cty. v. LAC Minerals, Inc.
 
 ,
 
 892 F.Supp. 1333
 
 , 1354 (D.N.M. 1995) ("Migration of residual contamination resulting from previous releases is not an ongoing discharge within the meaning of the Act.");
 
 Brewer v. Ravan
 
 ,
 
 680 F.Supp. 1176
 
 , 1183 (M.D. Tenn. 1988) ;
 
 cf.
 

 El Paso
 
 ,
 
 421 F.3d at 1140
 
 .
 

 Like those courts, I would conclude that the lasting effects of Kinder Morgan's past violation cannot give rise to a citizen suit under the CWA for two reasons. First, ongoing migration does not involve a point source, thus negating an essential element of a CWA violation. Second, ongoing migration is, by definition, nonpoint source pollution, which is outside of the CWA's reach.
 

 i.
 

 Ongoing migration from a site contaminated by a past discharge does not involve a point source and is thus not a cognizable violation under the CWA.
 
 See
 

 33 U.S.C. § 1362
 
 (12). Indeed, the lack of a discharging activity from a point source was the decisive factor for many courts in concluding that ongoing migration cannot support a CWA citizen suit. As the Tenth Circuit has summarized:
 

 The ongoing migration cases [in which the courts dismissed the citizen suits] ... all involve an identifiable discharge from a point source that
 
 occurred in the past
 
 , whether it be a spill,
 
 Wilson
 
 , 989 F.Supp. at 1163, the accidental leakage at a chemical plant,
 
 Hamker
 
 ,
 
 756 F.2d at 394
 
 , the discharge of lead shot and clay targets at a firing range,
 
 Remington Arms
 
 ,
 
 989 F.2d at 1309
 
 , or dumping of waste rock at a mine,
 
 LAC Minerals
 
 ,
 
 892 F.Supp. at 1337
 
 . At the time of suit, the discharging activity
 
 from a point source
 
 in all of these cases had ceased; all that remained was the migration, decomposition, or diffusion of the pollutants into a waterway.
 

 El Paso
 
 ,
 
 421 F.3d at 1140
 
 . Likewise, at the time of the Appellants' suit, the discharging activity from Kinder Morgan's point source (i.e., the gasoline leak) had ceased, and all that remained was migration of gasoline from the spill site to navigable waters. "Migration of residual contamination resulting from previous releases is not an ongoing discharge within the meaning of the [CWA],"
 
 LAC Minerals
 
 ,
 
 892 F.Supp. at 1354
 
 , because the point source itself is not conveying or introducing a pollutant into navigable waters,
 
 see
 

 Miccosukee Tribe
 
 ,
 
 541 U.S. at 105
 
 ,
 
 124 S.Ct. 1537
 
 ;
 
 Gorsuch
 
 ,
 
 693 F.2d at 175
 
 .
 

 The majority attempts to distinguish one of these migration cases from the Fifth Circuit,
 
 Hamker
 
 ,
 
 756 F.2d at 397
 
 , by observing that
 
 Hamker
 
 only dealt with an alleged discharge into groundwater and not navigable waters.
 
 See
 
 Maj. Op. at 648. But the court's analysis in
 
 Hamker
 
 did not
 turn on the issue of navigable waters; rather, it turned on the fact that the continuing addition of pollutants did not come from any point source.
 
 Hamker
 
 ,
 
 756 F.2d at 397
 
 . The majority further states in a footnote that "to the extent that
 
 Hamker
 
 's reasoning suggests that an ongoing violation requires that the point source continually discharge a pollutant,
 
 Hamker
 
 contravenes our decision in
 
 Goldfarb
 
 ." Maj. Op. at 649 n.9. The majority misplaces reliance on
 
 Goldfarb
 
 . This Court in
 
 Goldfarb
 
 observed that, under the Resource Conservation and Recovery Act's (RCRA) citizen suit provision,
 
 42 U.S.C. § 6972
 
 (a)(1)(A), "although a defendant's
 
 conduct
 
 that is causing a
 
 violation
 
 may have ceased in the past ... what is relevant is that the
 
 violation
 
 is continuous or ongoing."
 
 Goldfarb
 
 ,
 
 791 F.3d at 513
 
 . The statement in
 
 Goldfarb
 
 presumes that there already is an ongoing violation, does not help us in determining whether a polluter's past action with lasting effects should be viewed as past or ongoing violation, and is inapplicable to Kinder Morgan's situation because Kinder Morgan's CWA violation had ceased when its point source ceased discharging pollutants.
 

 ii.
 

 Moreover, migration of pollutants from the spill site amounts to an ongoing nonpoint source pollution. As discussed above, Congress chose not to regulate nonpoint source pollution through the NPDES permitting program.
 
 See, e.g.
 
 ,
 
 El Paso
 
 ,
 
 421 F.3d at
 
 1140 n.4 ;
 
 Forsgren
 
 ,
 
 309 F.3d at
 
 1183 ;
 
 Gorsuch
 
 ,
 
 693 F.2d at
 
 166 ;
 
 Appalachian Power
 
 ,
 
 545 F.2d at 1373-74
 
 . Nonpoint source pollution is commonly caused by the natural movements of rainfall or groundwater that wash off and carry pollutants from a large, diffuse area to navigable waters.
 
 Cordiano
 
 ,
 
 575 F.3d at 220
 
 ("[N]onpoint source pollution ... generally results from land runoff, precipitation, atmospheric deposition, or percolation.");
 
 El Paso
 
 ,
 
 421 F.3d at
 
 1140 n.4 ("Groundwater seepage that travels through fractured rock would be nonpoint source pollution, which is not subject to NPDES permitting.");
 
 Sierra Club v. Abston Constr. Co., Inc.
 
 ,
 
 620 F.2d 41
 
 , 44 (5th Cir. 1980) ("The focus of [the CWA] is on the 'discernible, confined and discrete' conveyance of the pollutant, which would exclude natural rainfall drainage over a broad area.");
 
 Tr. for Alaska v. EPA
 
 ,
 
 749 F.2d 549
 
 , 558 (9th Cir. 1984) ("Congress had classified nonpoint source pollution as runoff caused primarily by rainfall around activities that employ or create pollutants."). Nonpoint source pollution-caused by movements of rain or groundwater-"is very difficult to regulate through individual [NPDES] permits" because it "arises from many dispersed activities over large areas, and is not traceable to any single discrete source."
 
 Forsgren
 
 ,
 
 309 F.3d at 1184
 
 .
 

 Here, the Appellants have alleged ongoing migration from the spill site, which does not amount to a CWA violation. The Appellants have alleged that the groundwater flow from the spill site is introducing pollutants to navigable waters. Appendix ("App.") 8. Indeed, the Appellants' CWA case is built on the novel theory that the introduction of pollutants through the movement of hydrologically connected
 
 groundwater
 
 amounted to a CWA violation. Appellant Br. 26. As the record plainly shows, groundwater is carrying gasoline from the spill site, which spans in three different directions from the pipeline and covers a vast area. App. 99, 173. This kind of migration of pollutants through the natural movements of groundwater amounts to nonpoint source pollution.
 
 El Paso
 
 ,
 
 421 F.3d at
 
 1140 n.4 ;
 
 see also
 

 Forsgren
 
 ,
 
 309 F.3d at 1184
 
 . While there is no doubt this kind of nonpoint source pollution affects the quality navigable waters, Congress deliberately
 chose not to place nonpoint source pollution within the CWA's reach.
 
 [3]
 

 See,
 

 e.g.
 
 ,
 
 Abston Constr.
 
 ,
 
 620 F.2d at 44
 
 . In my view, therefore, because ongoing migration of pollutants is nonpoint source pollution, it is not cognizable under the CWA.
 

 In sum, I would conclude that ongoing migration of pollutants from a past discharge does not amount to an ongoing CWA violation.
 

 C.
 

 I do not take lightly the allegations of the severe environmental harm caused by Kinder Morgan. The Appellants have alleged facts suggesting a serious environmental disaster that cannot be easily overlooked as a mere peccadillo on the part of Kinder Morgan's operation and management. The allegations indicate that a full restoration will take many years and require tremendous resources.
 

 The severity of the situation alone, however, does not and cannot give rise to a citizen suit under the CWA. "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute."
 
 Kokkonen v. Guardian Life Ins. Co. of Am.
 
 ,
 
 511 U.S. 375
 
 , 377,
 
 114 S.Ct. 1673
 
 ,
 
 128 L.Ed.2d 391
 
 (1994). In creating a citizen suit provision under the CWA, Congress deliberately limited federal courts' jurisdiction such that they may entertain citizen suits only for allegations of ongoing CWA violations.
 
 33 U.S.C. § 1365
 
 (a) ;
 
 Gwaltney
 
 ,
 
 484 U.S. at 57
 
 ,
 
 108 S.Ct. 376
 
 . And Congress precisely defined a CWA violation as a point source discharge without an NPDES permit. The critical element-the addition from a point source-cannot be satisfied here because Kinder Morgan has repaired its pipeline and the pipeline is not currently leaking or adding pollutants to navigable waters. The Appellants can only point to nonpoint pollution from the spill site or the past violation, which cannot give rise to a citizen suit under the CWA.
 

 Barring the Appellants' citizen suit would not necessarily mean that Kinder Morgan will evade accountability. Under the CWA, the primary responsibility for enforcement rests with the state and federal governments.
 
 The Piney Run
 
 ,
 
 523 F.3d at 456
 
 . In fact, the State of South Carolina, through DHEC, has stepped in and is actively overseeing the remediation efforts. DHEC has directed Kinder Morgan to investigate the impact of the spill and implement corrective action plans. After a series of back and forth revisions between DHEC and Kinder Morgan, on March 1, 2017, DHEC approved the "Startup Plan for Surface Water Protection Measures" that was meant to implement additional remedial measures in the spill site. App. 351. Thus, even without a CWA citizen suit, the State of South Carolina is protecting and remediating the
 waters and natural resources within its borders. In addition to ordering Kinder Morgan to remediate the spill site, the state and federal governments are also empowered to use criminal, civil, and administrative enforcement actions for even for
 
 past
 
 violations of the CWA.
 

 Moreover, if a CWA citizen suit fails for lack of subject matter jurisdiction, other state and federal laws may provide actionable claims against Kinder Morgan. South Carolina state law may provide a more encompassing response. As the
 
 amici
 
 States have pointed out, Brief of the
 
 Amici
 
 States 22-23, South Carolina law provides for the state to recover monetarily from polluters for violations that includes even nonpoint source pollution,
 
 see
 
 S.C. Code § 48-1-90(a)(1). In addition to the enforcement mechanism under state law, other federal laws could provide recourse. In response to Kinder Morgan's past spill, a federal citizen suit may perhaps be more appropriate under the Comprehensive Environmental Response, Compensation, and Liability Act,
 
 42 U.S.C. § 9601
 

 et seq.
 
 , which is "designed to effectuate the cleanup of toxic waste sites" and to impose cleanup costs,
 
 Meghrig v. KFC W., Inc.
 
 ,
 
 516 U.S. 479
 
 , 483,
 
 116 S.Ct. 1251
 
 ,
 
 134 L.Ed.2d 121
 
 (1996) (citations omitted), or under the RCRA,
 
 42 U.S.C. § 6901
 

 et seq.
 
 , which concerns with the disposal of hazardous waste,
 
 Aiello
 
 ,
 
 136 F.Supp.2d at 121
 
 ("It is RCRA, rather than the CWA, that appropriately addresses liability for ongoing contamination by past polluters.").
 

 The Appellants have raised serious allegations but, in my view, the CWA citizen suit is not the proper mechanism to seek redress. Therefore, the district court lacked subject matter jurisdiction and the complaint failed to state a claim upon which relief can be granted.
 

 IV.
 

 For the reasons above, I would affirm the district court's dismissal of the Appellants' complaint. I respectfully dissent.
 

 While the text and structure speak unambiguously, for those who may find legislative history persuasive, the CWA's legislative history similarly confirms Congress's focus on point source pollution. Congress added the term "point source" "as a means of identifying industrial polluters" to narrow and clarify the scope of the CWA.
 
 United States v. Plaza Health Labs., Inc.
 
 ,
 
 3 F.3d 643
 
 , 647 (2d Cir. 1993). The Senate Report for the CWA explains:
 

 In order to further clarify the scope of the regulatory procedures in the Act [sic] the Committee has added a definition of point source to distinguish between control requirements where there are specific confined conveyances, such as pipes, and control requirements which are imposed to control runoff. The control of pollutants from runoff is applied pursuant to Section 209 and the authority resides in the State or local agency.
 

 S. Rep. No. 92-414 (1972),
 
 as reprinted in
 
 1972 U.S.C.C.A.N. 3668, 3744. The narrowing of Congress's regulatory focus resulted "in part because nonpoint sources were far more numerous and more technologically difficult to regulate," whereas "point sources ... tended to be more notorious and more easily targeted."
 
 Or. Nat. Def. Ass'n
 
 ,
 
 550 F.3d at 780
 
 ;
 
 see also
 
 S. Rep. No. 92-414, at 39 ("[M]any nonpoint sources of pollution are beyond present technology of control"). Whatever the reason, the legislative history confirms that Congress intended to focus on point source pollution in enacting the CWA.
 

 A citizen invoking the CWA citizen suit provision must first show that she has Article III and statutory standing to bring the suit.
 
 See
 

 33 U.S.C. § 1365
 
 (g) ;
 
 Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.
 
 ,
 
 204 F.3d 149
 
 , 152 (4th Cir. 2000) (en banc). Moreover, the citizen may not commence suit prior to 60 days after giving notice of the alleged violation to the appropriate governmental authority and the alleged polluter.
 
 33 U.S.C. § 1365
 
 (b)(1)(A). Lastly,
 
 33 U.S.C. § 1365
 
 (b)(1)(B)"bars a citizen from suing if the EPA or the State has already commenced, and is 'diligently prosecuting,' an enforcement action."
 
 Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.
 
 ,
 
 528 U.S. 167
 
 , 175,
 
 120 S.Ct. 693
 
 ,
 
 145 L.Ed.2d 610
 
 (2000). Congress instituted these restrictions on the CWA citizen suit provision "to strike a balance between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts with excessive numbers of citizen suits."
 
 Hallstrom v. Tillamook Cty.
 
 ,
 
 493 U.S. 20
 
 , 29,
 
 110 S.Ct. 304
 
 ,
 
 107 L.Ed.2d 237
 
 (1989).
 

 An exception to this general rule is that the "[g]ravity flow, resulting in a discharge into a navigable body of water, may be part of a point source discharge if the [polluter] at least initially collected or channeled the water and other materials."
 
 AbstonContr.
 
 ,
 
 620 F.2d at 45
 
 . This is because, once a polluter attempts to channel, collect, or otherwise redirect the flow of water, such an effort becomes a "discernible, confined and discrete" conveyance.
 
 33 U.S.C. § 1362
 
 (14) ;
 
 see also
 

 Sierra Club v. Va. Elec. Power Co.
 
 ,
 
 247 F.Supp.3d 753
 
 , 763 (E.D. Va. 2017) ("Dominion built the piles and ponds to concentrate [pollutants] in one location ... [which] channels and conveys [pollutants] directly into groundwater and thence into the surface waters. Essentially they are discrete mechanisms...."). The Appellants have not alleged that Kinder Morgan has at all attempted to channel, collect, or redirect the free flow of groundwater.
 
 See
 
 App. 419.